[No. H026802. Sixth Dist. Mar. 29, 2005.]

ELAINE EVANS, Plaintiff and Appellant, v.
CITY OF SAN JOSE et al., Defendants and Respondents.

1124

1128

COUNSEL

Howrey Simon Arnold & White, Michelle A. Madriaga and Daniel T. Shvodian for Plaintiff and Appellant.

Richard Doyle, City Attorney, Nora Frimann, Chief Trial Attorney, and Sandra Lee, Associate Deputy City Attorney, for Defendants and Respondents.

OPINION

**BAMATTRE-MANOUKIAN, Acting P. J.**—Plaintiff Elaine Evans appeals from a judgment in favor of the City of San Jose (the City) and the Redevelopment Agency of San Jose (the Agency), in which the trial court upheld a redevelopment plan adopted by the City. Her principal claim on appeal is that there was no substantial evidence in the record of the administrative proceedings to support the City's findings of blight in the areas affected by the redevelopment plan, within the meaning of the statutory definition of blight. (Health & Saf. Code, §§ 33030, 33031.) She also contends that the trial court erred in finding that she had failed to exhaust her administrative remedies, and in denying her request to augment the administrative record with additional evidence. And she argues that the court erred in denying her request for injunctive and declaratory relief.

We find that many of the specific claims of error appellant asserted in her complaint, and asserts here on appeal, were not raised during the course of the administrative proceedings. The doctrine of exhaustion of administrative remedies limits the scope of issues subject to judicial review to those that the administrative agency has had the opportunity to consider. (*Leff v. City of Monterey Park* (1990) 218 Cal.App.3d 674, 681 [267 Cal.Rptr. 343].) Consequently, the issues not raised before the administrative agency are not preserved for review by the courts. We further find that the court did not abuse its discretion in denying appellant's request to augment the record with documents that were not before the City when the redevelopment plan was adopted. With the record and the scope of our review thus limited, we find that the City's adoption of the redevelopment plan, including the finding of blight, was supported by the evidence. Appellant's cause of action for injunctive and declaratory relief must fail, as it was dependent upon her success in invalidating the redevelopment plan. We therefore affirm the judgment.

# BACKGROUND

## I. *California Community Redevelopment Law*

■ The California Redevelopment Act was enacted in 1945 to address problems of urban blight. It provides that cities and counties can establish redevelopment agencies with the authority to acquire and sell real property, to impose land use and development controls, and to finance their operations by borrowing from federal or state governments. Tax-increment financing was later added to the body of redevelopment law, enabling redevelopment agencies to receive property tax revenues from the increase in assessed value occurring after the adoption of a redevelopment plan. The provisions of the California Redevelopment Act are contained in Health and Safety Code, section 33000 et seq., known as the California Community Redevelopment Law (CRL).[1]

■ Any city or county in California may establish a redevelopment agency. (§§ 33101, 34115.) As is the case in San Jose, the governing body of the city or county may also be the governing body of the redevelopment agency. (§ 33200.) A redevelopment agency is empowered to prepare and carry out plans for the improvement, rehabilitation, and redevelopment of blighted areas in the city or county, but must act in accordance with the statutory provisions of the CRL. (§§ 33131, 33100, 33112.) A redevelopment agency is unique among public entities in that it works in conjunction with the private sector—private lenders, developers, owners and tenants—in order to achieve the goal of eliminating blight. Furthermore, redevelopment agencies have the ability to use public funds generated by tax-increment financing to subsidize private enterprise. (§ 33670.)

■ The first step in the process of adopting a redevelopment plan is to designate a survey area, in order to determine whether a redevelopment project is feasible within that area. Since the public purpose justifying the extraordinary powers given to the redevelopment agency by the CRL is to eliminate blight, the essential prerequisite for identifying a project area is that there be blight within the area. The characteristics of blight are described in detail in CRL sections 33030 and 33031. The blighting conditions must predominate in such a way as to affect the utilization of the area, causing a physical and economic burden on the community.

Section 33030, subdivision (b), provides that a blighted area is one that contains *both* of the following: "(1) An area that is predominantly urbanized, . . . and is an area in which the combination of conditions set forth in

---

[1] All further statutory references are to the Health & Safety Code.

Section 33031 is so prevalent and so substantial that it causes a reduction of, or lack of, proper utilization of the area to such an extent that it constitutes a serious physical and economic burden on the community which cannot reasonably be expected to be reversed or alleviated by private enterprise or governmental action, or both, without redevelopment.

"(2) An area that is characterized by either of the following: [¶] (A) One or more conditions set forth in any paragraph of subdivision (a) of Section 33031 [listing elements of physical blight] and one or more conditions set forth in any paragraph of subdivision (b) of Section 33031 [listing elements of economic blight]. [¶] (B) The condition described in paragraph (4) of subdivision (a) of Section 33031." The condition last referred to is "[t]he existence of subdivided lots of irregular form and shape and inadequate size for proper usefulness and development that are in multiple ownership." (§ 33031, subd. (a)(4).)

A blighted area may also be one characterized by "the existence of inadequate public improvements, parking facilities, or utilities." (§ 33030, subd. (c).) Nonblighted areas may be included in the project area if their inclusion is necessary for the effective redevelopment of the project area. (§ 33321.)

Once the proposed project area is identified, the agency is responsible for preparing a "Preliminary Report," which identifies the types of blighting conditions in the project area, within the statutory definitions, as well as describing the scope and purpose of the proposed redevelopment plan. (§ 33344.5.) This report becomes the basis for the agency's final report to the legislative body (hereafter referred to as the Existing Conditions Report), containing the evidence and analysis to support the findings of the legislative body adopting the redevelopment plan.

In certain cases, the city or county must establish a Project Area Committee (PAC), consisting of property owners, tenants, business people and members of community organizations within the project area. (§ 33385.) The agency must consult with the PAC throughout the process concerning policy matters affecting residents of the project area. (§ 33386.) The proposed redevelopment plan must be submitted to the PAC for its review and recommendations prior to adoption by the legislative body. And the PAC continues to function as a liaison between the agency and the community as the redevelopment plan is implemented.

■ The proposed redevelopment plan is also reviewed by the planning agency of the city or county. (§§ 33346, 33347.5.) The agency submits the recommendations of the PAC and the planning agency to the city or county, along with the final Existing Conditions Report, a five-year implementation plan describing specific goals and objectives, an analysis of proposed financing methods, a relocation plan, and an environmental impact report. (§ 33352.)

■ Public hearings are held by the PAC and the planning agency, and by the agency and the legislative body of the city or county prior to the adoption of a redevelopment plan. (§§ 33348, 33360.) The CRL provides that members of the public may voice objections at the public hearing before the legislative body, and also may submit written objections to the plan. If written objections are received, the legislative body must respond in writing to the objections before finally adopting the plan, and must "giv[e] reasons for not accepting specified objections and suggestions." (§ 33363.)

■ The redevelopment plan is then adopted by an ordinance incorporating the Preliminary Report, the Existing Conditions Report, and the city's responses to all written objections to the plan. The ordinance must contain all of the findings required by statute, including the essential findings that the project area is a blighted area, and that redevelopment is necessary to remedy blighted conditions in order to promote the general health, safety and welfare of those living in the community. (§ 33367.)

II. *The SNI Redevelopment Plan*

In this case, the process began in 1999, when the San Jose Redevelopment Agency identified a number of neighborhoods in the downtown area to be surveyed for feasibility as a proposed new redevelopment project area. Eventually the proposed area included 22 neighborhoods, and it was ultimately designated the "Strong Neighborhoods Initiative" (SNI) "Project Area" (Project Area) A preliminary redevelopment plan was approved in October of 2001. It set forth the proposed geographic boundaries and generally described the goals of the proposed SNI Redevelopment Plan: to improve the physical conditions of the neighborhoods, enhance community safety, improve the economic viability of individual neighborhoods, and develop a stronger sense of community.

A Project Action Committee was formed in 2001, consisting of 52 representatives of residential property owners, residential tenants, business owners, and community organizations within the proposed Project Area. The PAC held monthly public meetings from July of 2001 through May of 2002, to review various aspects of the proposed SNI Redevelopment Plan. In addition

to its regular meetings, the PAC held a workshop with the SNI Neighborhood Advisory Committees (NAC's) to discuss issues affecting the neighborhoods. The PAC then drafted policy recommendations to submit to the Agency/City Council.

The Preliminary Report assessing blight conditions in the Project Area was prepared by the consulting firm of Keyser Marston Associates, Inc. (KMA). The Preliminary Report described the Project Area as consisting of 22 neighborhoods, primarily in the vicinity of downtown San Jose, which were grouped in six noncontiguous subareas totaling approximately 10,456 acres. The report explained that the Project Area was "an integral part of an urbanized area." It spoke of the City's commitment "to revitalize the older neighborhoods by implementing programs aimed at removing the conditions that substantially hinder the economically viable use of the neighborhood properties. . . . The goal is to build clean, economically viable, safe, and attractive neighborhoods with independent and capable neighborhood organizations." KMA conducted a widespread survey throughout the Project Area, and collected and compiled field data documenting the statutory physical and economic blighting conditions. KMA also prepared a financing report, assessing the economic feasibility of the proposed methods of financing the redevelopment plan.

KMA completed the Preliminary Report in February of 2002. At a public meeting on May 22, 2002, the PAC recommended adoption of the proposed SNI Redevelopment Plan. Reflecting input from area residents, however, the PAC recommended an amendment limiting the use of the Agency's power of eminent domain. The City planning commission certified the environmental impact report and recommended approval of the SNI Redevelopment Plan.

There followed a joint public hearing of the City Council and the Agency Board on June 11, 2002, at which concerned citizens had the opportunity to raise objections to the proposed Plan. One hundred and twenty people spoke in response to the SNI Plan at this meeting, and many others submitted written objections. KMA's final Existing Conditions Report was submitted to the City Council at this time. The City Council approved the PAC amendment to the plan with respect to the use of the Agency's eminent domain power, and also deleted part of the Project Area. The City Council/Agency voted to adopt the plan as amended.

The Agency then prepared responses to written objections to the Plan. On June 25, 2002, the City approved the responses and passed City Ordinance No. 26662, adopting the SNI Redevelopment Plan. City Ordinance No. 26663 was also passed, which merged the SNI Redevelopment Plan into the "Merged Area Redevelopment Plan." The "Merged Area" consisted of 20 previously existing redevelopment plans.

On July 24, 2002, appellant's counsel wrote to the Agency, setting forth numerous detailed objections to the methodology and the evidence contained in KMA's Existing Conditions Report to support the findings of blight. This letter was hand-delivered to the Agency/City Council, along with numerous photographs and a videotape. Counsel for the Agency responded August 19, 2002, informing appellant that her objections were untimely and that the City Council had adopted responses to all timely filed protests on June 25, 2002. Counsel informed appellant that the City Council had "determined that all necessary requirements for the adoption of the SNI Redevelopment Plan, including the requisite finding of blight, were satisfied." These findings, counsel explained, were based on the extensive record, and on the requirements of the CRL.

### III. *Proceedings in the Trial Court*

On August 21, 2002, appellant, who owns property in the SNI Project Area, filed a complaint in superior court to challenge the validity of the SNI Redevelopment Plan, and for declaratory and injunctive relief. Her principal allegation was that there was not substantial evidence in the Existing Conditions Report to support the City Council's finding of blight in the SNI Project Area. She further alleged that other key findings required by the CRL were not supported by evidence in the report: for instance, nonblighted property was improperly included in the Project Area (§ 33321); noncontiguous property was improperly included in the Project Area (§ 33320.2, subd. (a)(2)); the Plan did not include specific projects (§ 33352, subd. (c)); and there was no evidence to support the finding that private enterprise alone could not accomplish redevelopment of the Project Area (§ 33367, subd. (d)(11)).

The City and the Agency (hereafter, respondents) answered the complaint. They further asserted in a second affirmative defense that appellant had failed to exhaust her administrative remedies, and in a third affirmative defense that the issues raised in her complaint were outside the scope of the issues raised before the Agency in the course of the administrative proceedings.

Both sides submitted lengthy opening and responding trial briefs. Appellant attached a number of exhibits to her trial brief, including the letter her attorney had delivered to respondents July 24, 2002, setting forth her objections to the adoption of the SNI Redevelopment Plan.

A hearing was held on September 22, 2003. The trial court denied appellant's request to augment the administrative record to include her letter of July 24, 2002, and several other exhibits attached to her trial brief. The court further ruled in favor of respondents on their second and third affirmative defenses, finding that appellant had failed to exhaust her administrative

remedies by not raising her detailed and specific challenges to the evidence underlying the SNI Redevelopment Plan during the administrative process, so that the Agency could evaluate and respond to her objections. On the merits the court found that respondents had complied with the substantive and procedural requirements of the The purpose ofCRL, and that substantial evidence supported the findings contained in the ordinance adopting the SNI Redevelopment Plan. Judgment in favor of respondents was filed October 7, 2003.

## THRESHOLD ISSUES

On appeal, appellant raises challenges to the adoption of the SNI Redevelopment Plan similar to those asserted in the trial court, primarily regarding the sufficiency of the evidence in the KMA Report to support the findings of blight. (§§ 33030, 33031.) She contends that the survey methods used by KMA were inadequate and that the analysis of data produced inaccurate and misleading results. She also challenges the City's findings that the inclusion of nonblighted areas was necessary to the redevelopment plan (§ 33321), and that the conditions of blight could not be addressed by government action or private enterprise alone, without the need for redevelopment. (§ 33030, subd. (b)(1).) Before reaching the merits, however, we must address the trial court's ruling that appellant failed to exhaust her administrative remedies, and the court's denial of her request to augment the administrative record.

### I. *Exhaustion of Administrative Remedies*

 The question whether the doctrine of exhaustion of administrative remedies applies in a given case raises legal issues, which we review de novo. (*Anthony v. Snyder* (2004) 116 Cal.App.4th 643, 654 [10 Cal.Rptr.3d 505].)

 As our summary of the law indicates, the CRL expressly provides for a comprehensive administrative review process prior to the adoption of a redevelopment plan. (§§ 33360–33364.) Participation in that review process is a jurisdictional prerequisite to bringing a subsequent court action challenging the adoption of the redevelopment plan. (*Redevelopment Agency v. Superior Court* (*Birbeck*) (1991) 228 Cal.App.3d 1487, 1492–1493 [279 Cal.Rptr. 558].) A challenger who has participated in the administrative process must also show that the issues raised in the judicial proceeding were raised at the administrative level. (*Morgan v. Community Redevelopment Agency* (*Morgan*) (1991) 231 Cal.App.3d 243, 258 [284 Cal.Rptr. 745].)

The purpose of the doctrine has been summarized as follows: " 'The requirement of exhaustion of administrative remedy is founded on the theory that the administrative tribunal is created by law to adjudicate the issue sought to be presented to the court, and the issue is within its special jurisdiction.' [Citation.] The rule affords the public agency an 'opportunity to receive and respond to articulated factual issues and legal theories before its actions are subjected to judicial review.' [Citation.] Thus, by presenting the issue to the administrative body, the agency 'will have had an opportunity to act and render the litigation unnecessary' [citations] and, in so doing, 'lighten the burden of overworked courts in cases where administrative remedies are available and are as likely as the judicial remedy to provide the desired relief. [Citations.]' [Citation.] Finally, the doctrine 'is viewed with favor . . . because it facilitates the development of a complete record that draws on administrative expertise and promotes judicial efficiency.' [Citation.]" (*Leff v. City of Monterey Park, supra,* 218 Cal.App.3d at p. 681.)

Here the record indicates that appellant participated in the administrative process by attending various hearings leading to the adoption of the SNI Redevelopment Plan, along with numerous other property owners affected by the plan. She contends that she wrote "several postcards" to City Council members expressing her opposition, and that she discussed objections to the Plan with others who spoke at the June 11, 2002 hearing. However, her only objection on the record prior to the adoption of the Plan was her signature on a petition objecting to the use by the Agency of the power of eminent domain.

 Respondents contend that appellant can only raise issues in her legal action that she herself personally raised during the administrative hearings. We disagree with them on this point. An individual challenging a redevelopment plan need not have personally raised each issue at the administrative level, but may rely upon issues raised or objections made by others, even though they do not later join in the lawsuit, so long as the agency had the opportunity to respond. (*Leff v. City of Monterey Park, supra,* 218 Cal.App.3d at p. 682.) The policies of the exhaustion doctrine have been served if issues are raised for evaluation and resolution during the administrative process by similarly situated property owners, one or more of whom later file suit raising those same issues. "Nothing more could effectuate the policy of the exhaustion doctrine. To require [the named plaintiffs] to have personally appeared, in addition to the others, . . . would serve no additional purpose." (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 268 [104 Cal.Rptr. 761, 502 P.2d 1049]; see also *Gonzales v. City of Santa Ana* (1993) 12 Cal.App.4th 1335, 1348, fn. 17 [16 Cal.Rptr.2d 132].) Furthermore, as appellant points out, each individual property owner in this case was limited to two minutes at the public hearing before the Agency on June 11, 2002. It

would be impractical to require each individual to repeat all objections raised by all of the other speakers in order to preserve the issues for review.

The closer question regarding application of the exhaustion doctrine bears upon the scope of the issues raised during the administrative process. The purposes of the doctrine are not satisfied if the objections are not sufficiently specific so as to allow the Agency the opportunity to evaluate and respond to them. (*Park Area Neighbors v. Town of Fairfax* (1994) 29 Cal.App.4th 1442, 1447 [35 Cal.Rptr.2d 334] (*Fairfax*).) "The essence of the exhaustion doctrine is the public agency's opportunity to receive and respond to articulated factual issues and legal theories *before* its actions are subjected to judicial review." (*Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1198 [200 Cal.Rptr. 855] (*Fullerton*), italics in original.)

▮ As appellant points out, courts have acknowledged that the citizens who object during an administrative process need not be held to the same degree of specificity as would be required during a judicial action, because they are often not represented by counsel. (*East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 176–177 [258 Cal.Rptr. 147] (*Palos Verdes*).) "To hold such parties to knowledge of the technical rules of evidence and to the penalty of waiver for failure to make a timely and specific objection would be unfair for them." (*Id.* at p. 177.) In the *Palos Verdes* case, the court found that the objectors' complaints were sufficient to alert the agency to issues regarding the cumulative impacts of a proposed project that were later raised in a petition for a writ of mandate. The objections before the agency included an 11-page letter and several comments specifically directed to the issue of the cumulative effects. (See also *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151 [217 Cal.Rptr. 893] [plaintiffs raised the failure to consider cumulative effects in the administrative proceeding through oral objections and a letter to the agency prior to its decision].)

▮ On the other hand, although affected property owners are accorded some latitude during the administrative process, they must "make their objections known in *some* fashion, however unsophisticated. Otherwise the [agency] would have no opportunity to respond to those objections prior to judicial review—which is the 'essence of the exhaustion doctrine.' " (*Fairfax, supra,* 29 Cal.App.4th at p. 1449.) For example, in the *Fairfax* case, neighbors of a proposed low-income housing project raised general concerns at a planning commission meeting and a later town council meeting about parking, traffic, and increased numbers of residents in the neighborhood. When the project was approved, an association of neighbors filed a petition for writ of mandate, raising specific challenges regarding the study underlying the traffic impact permit, and claiming that the project was inconsistent

with the town's zoning ordinances pertaining to density. The writ petition was denied. On appeal the court acknowledged "the 'less specificity' rule applicable to unrepresented persons in administrative proceedings [citation]," but found nonetheless that "[t]he neighbors' expressions of concern about the number of potential residents, parking, traffic and density in the neighborhood were too general to alert the town to the issues now asserted." (*Fairfax, supra,* 29 Cal.App.4th at p. 1450.)

Similarly, in the *Fullerton* case, the court found that general assertions of concern by citizens about the environment did not amount to articulated issues regarding the sufficiency of a negative declaration to satisfy the requirements of the California Environmental Quality Act (CEQA). "The doctrine [of exhaustion of administrative remedies] was not satisfied here by a relatively few bland and general references to environmental matters. The city was entitled to consider any objection to proceeding by negative declaration in the first instance, if there was one. Mere objections to the *project*, as opposed to the procedure, are not sufficient to alert an agency to an objection based on CEQA. Petitioners, having failed to raise their CEQA claims at the administrative level, cannot air them for the first time in the courts." (*Fullerton, supra,* 153 Cal.App.3d at p. 1198.)

In *City of Walnut Creek v. County of Contra Costa* (1980) 101 Cal.App.3d 1012 [162 Cal.Rptr. 224], the objector opposed the approval of a land use permit for construction of an apartment complex and argued the issue of increased density, but only in general terms. The subsequent petition for writ of mandate, however, alleged the project would violate specific density limitations in the county's general plan. The trial court denied the petition, in part for failure to raise the issue before the administrative body. The Court of Appeal affirmed: "[A]ppellate review is limited to issues in the record at the administrative level. . . . 'It was never contemplated that a party to an administrative hearing should . . . make only a perfunctory or "skeleton" showing in the hearing and thereafter obtain an unlimited trial de novo, on expanded issues, in the reviewing court. [Citation.] The rule compelling a party to present all legitimate issues before the administrative tribunal is required in order to preserve the integrity of the proceedings before that body and to endow them with a dignity beyond that of a mere shadow-play.' " (*Id.* at pp. 1019–1020, quoting *Bohn v. Watson* (1954) 130 Cal.App.2d 24, 37 [278 P.2d 454].)

Appellant contends that all that is required is that the objections raised during the administrative process put the agency "on notice" of the nature of the issues. Under the CRL, however, the Agency is required to "accept, evaluate and resolve disputes or complaints" before deciding to adopt a redevelopment plan. (*City of Coachella v. Riverside County Airport*

*Land Use Com.* (1989) 210 Cal.App.3d 1277, 1287 [258 Cal.Rptr. 795]; § 33363.) Thus the objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them. Otherwise, the purpose of the exhaustion doctrine would not be served, since the courts would be called upon to step outside their limited role of reviewing the decisionmaking process of the administrative agency in order to conduct evidentiary hearings and resolve disputes in the first instance.

Applying these principles underlying the doctrine of exhaustion of administrative remedies to the record before us, we conclude that for the most part the objections raised regarding the SNI Redevelopment Plan during the administrative proceedings were too general to alert the agency to the host of alleged technical deficiencies in the KMA Report that were asserted in the trial court. The scope of issues properly preserved for judicial review is therefore limited, as we explain more fully below.

## II. *The Scope of the Issues and the Administrative Record*

Our review of the extensive record of the administrative proceedings indicates that objections voiced by concerned citizens were mainly focused on the Agency's power of eminent domain or on the insufficiency of the notice for the various public meetings. The Agency responded to the concerns about eminent domain and amended the Plan. Neither the eminent domain power nor the sufficiency of the notice were at issue in the trial court proceedings. Rather, the allegations in appellant's complaint focused on claims that the Agency's findings of blight in the SNI Project Area did not meet statutory criteria and were not supported by substantial evidence in the KMA Report. Other claims alleged that the Agency improperly included nonblighted property within the project area that was not necessary for effective redevelopment (§ 33321), and that there was a lack of evidence to support the finding under section 33030, subdivision (b)(1), that redevelopment was necessary.

Appellant contends that all of these issues were raised by her and others during the administrative proceedings. She relies chiefly on two lengthy letters to the Agency, one regarding the so-called Mitchell Block, and the other written by her attorney and delivered to respondents on July 24, 2002, after the SNI Redevelopment Plan had been adopted the previous month.

### The Mitchell Block Letter

This letter was submitted on behalf of the owner of one of the parcels, which were known collectively as the Mitchell Block. It set forth numerous objections as to why a particular area of downtown property should not be included in the

SNI Redevelopment Project Area. Appellant argues that the objections set forth in this so-called Mitchell Block letter, which included detailed argument that the evidence and analysis in the KMA Existing Conditions Report did not comply with the statutory requirements of the CRL, constituted factual issues and legal theories that the Agency had the " 'opportunity to receive and respond to.' " (*Leff v. City of Monterey Park, supra,* 218 Cal.App.3d at p. 681, quoting *Fullerton, supra,* 153 Cal.App.3d at p. 1198.) Therefore, issues raised in the letter were preserved for judicial review. We disagree, for the following reasons.

The Mitchell Block letter related specifically to a section of downtown property in the St. James Square area that was the subject of a proposed "15th Amendment" to the Century Center Redevelopment Plan. The letter asked the Agency to delete this area from the SNI Plan for reasons unrelated to the findings of blight in the rest of the SNI Project Area. The letter submitted that these were "sufficient reasons . . ." and did "not involve any issues of whether technically sufficient evidence exists to support the findings necessary for the establishment of a redevelopment plan." The letter then went on to argue that if the City did not reject the proposed 15th Amendment on these grounds, it should do so because the evidence in the KMA Report did not support the statutorily required findings of blight. Most of this analysis was also specific to the Century Center area, although it also challenged the underlying survey methodology employed by KMA.

Just prior to the adoption of the SNI Plan, the downtown area that had prompted the Mitchell Block letter (the Added Area) was deleted from the SNI Project Area.[2] As to appellant's contention that the objections contained in the letter were preserved for appeal, the trial court ruled that because this area was no longer a part of the SNI Plan, the objections had effectively been withdrawn. Therefore appellant could not rely on this letter as a basis for asserting that those objections had been raised and considered by the City before it acted to adopt the SNI Plan. We agree with the trial court.

When the Added Area was deleted from the SNI Project Area, the Mitchell Block objections were no longer before the City Council. Appellant argues that the City was nonetheless on notice of these objections because they had been a part of the record. However, the record does not show any attempt on the part of appellant, or any other objector, to notify the City that they were continuing to assert the objections set forth in the Mitchell Block letter, insofar as the objections pertained to the rest of the SNI Project Area. Consequently, respondents did not have the opportunity, or the duty under section 33363, to evaluate and prepare responses to these objections. No

---

[2] This Added Area apparently became part of a different redevelopment plan, which was adopted later, after further review, and is not a subject of this appeal.

responses were prepared or adopted by the City. We conclude on this record that the objections contained in the Mitchell Block letter were not raised or considered by the City in its adoption of the SNI Plan. The doctrine of exhaustion of administrative remedies therefore precludes appellant from raising those issues for the first time in the judicial forum.

### The July 24, 2002 Letter and Response

The public hearing on June 11, 2002, was the last date by which to make oral objections to the SNI Redevelopment Plan and to submit written objections. (§ 33362.) The City adopted responses to all filed written objections on June 25, 2002, at which time the Plan was finally approved and adopted. On July 24, 2002, appellant's counsel submitted a lengthy letter to respondents setting forth extensive and specific objections to the evidence and findings in the KMA Report and asking respondents to reconsider adoption of the Plan. Counsel for the Agency responded on August 19, 2002, informing appellant that because her protest was not timely, no response was legally required. The Agency's letter assured appellant that the City Council had "determined that all necessary requirements for the adoption of the SNI Redevelopment Plan, including the requisite finding of blight, were satisfied." The letter further assured her that the agency's finding of blight was based on the extensive documents in the record, and on the requirements of the CRL.

Appellant argues that her July 24, 2002 letter and the Agency's response constituted objections sufficient to establish that she exhausted her administrative remedies on the issues raised in the letter. Again, we disagree. Appellant's objections were submitted nearly a month after the Agency had formally adopted the SNI Plan, and thus did not present issues that the Agency could have considered in its decisionmaking process.

Appellant argues that by receiving her objections and responding to them, the Agency exercised its discretion under CRL section 33363 to extend or reopen the proceedings, and that her letter and the response should therefore be made a part of the administrative record. Section 33363 provides in part that "[b]efore adopting the redevelopment plan the legislative body shall . . . make written findings in response to each written objection of an affected property owner. . . . The legislative body shall respond in writing to the written objections received before or at the noticed hearing, including any extensions thereof, and may additionally respond to written objections that are received after the hearing." Written objections are to be addressed "in detail," with a "good-faith, reasoned analysis." (§ 33363.)

We do not believe that section 33363 applies in the circumstances here. Appellant's letter was not only received "after the hearing," it was received after all of the written responses had been approved and the ordinance had been passed adopting the SNI Redevelopment Plan. Thus the Agency could not have responded to her objections "[b]efore adopting the redevelopment plan . . . ." (§ 33363.) The Agency's letter correctly pointed out that appellant's objections were not timely and that "no response was legally required." The Agency's response was clearly not a "reasoned analysis" of appellant's exhaustive list of objections. As a courtesy, the Agency's attorney simply assured appellant that when the City Council adopted the Plan, it was aware of a recent case she had pointed out in her letter, and that it made all the proper determinations and findings based on the record.

Appellant makes the further argument that the SNI Plan was not officially effective until July 25, 2002, thirty days after it was adopted. We reject this argument. The adoption of the Plan on June 25, 2002, signaled the close of the administrative proceedings, even though the Plan did not go into effect for thirty days. Objections raised after the adoption of the Plan were not a part of the administrative process, and there is no authority for extending the time for receiving objections beyond that date.

 Appellant attached her letter and the Agency's response as exhibits to her trial brief, and she asked the trial court to augment the administrative record to include them. The court denied that request and refused to consider the documents as part of the record. We review that ruling for abuse of discretion. (*Cadiz Land Co. v. Rail Cycle, L.P.* (2000) 83 Cal.App.4th 74 [99 Cal.Rptr.2d 378].) A court may exercise its discretion to augment an administrative record if the evidence is relevant and if it was either improperly excluded during the administrative process or it could not, in the exercise of reasonable diligence, have been presented before the administrative decision was made. (Code Civ. Proc., § 1094.5, subd. (e); *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) Appellant offered no explanation why her letter of July 24, 2002 could not have been submitted sooner, particularly since she contends she was actively involved throughout the administrative process and had discussed her objections to the blight analysis with other residents. She simply contends that her letter and the Agency's response were "improperly excluded" from the administrative record. (See *Gonzales v. City of Santa Ana, supra,* 12 Cal.App.4th at p. 1342, fn. 7.) This is not a sufficient showing. Appellant's written objections were submitted six weeks after the deadline for such objections, and after the City had completed its decision-

making process and had adopted the Plan. A fundamental rule of administrative law is that a court's review is confined to an examination of the record before the administrative agency at the time it takes the action being challenged. (*Ibid.*; *Morgan, supra,* 231 Cal.App.3d at p. 258; Code Civ. Proc., § 1094.5.) Under the circumstances we find no abuse of discretion in the trial court's denial of appellant's request to augment the administrative record.

*The Methodology and Analysis of Data in the Existing Conditions Report*

Appellant's arguments regarding the sufficiency of the evidence of blight stem from her claims that the methodology underlying KMA's Existing Conditions Report was faulty in numerous respects. Her contentions include the following: KMA improperly used City code enforcement employees instead of its own employees to conduct the surveys; the blight conditions were based on local code violations rather than on the CRL; the surveyors, who had no special training, conducted only superficial "sidewalk surveys" compiling tallies on preprinted sheets; the surveys relied only on visual inspections from the sidewalk without any structural inspection of specific buildings; the survey sheets included factors that did not necessarily indicate blight; there was no evidence of any unsafe or unhealthy conditions; KMA's tabulation of the results of the survey data was devoid of any meaningful analysis; KMA improperly aggregated criteria; the survey lacked uniformity and contained unverifiable conclusions; and KMA's "block by block" methodology and "overbroad definitions" of blight did not conform to CRL requirements.

Although several people at the hearing and in written objections submitted during the administrative process questioned that there was blight in selected neighborhoods, there were no specific objections to the data-gathering and compiling methods of KMA or to the analysis in its report, and certainly nothing approaching the extensive and detailed objections presented by appellant. Under similar circumstances, courts have applied the doctrine of exhaustion of administrative remedies to preclude review. For example, in *Running Fence Corp. v. Superior Court* (1975) 51 Cal.App.3d 400 [124 Cal.Rptr. 339], the court observed that alleged violations of CEQA had not been raised at the administrative level, and were therefore barred: "In the absence of a showing that the foregoing technical deficiencies . . . were voiced at [the agency's public hearings] they cannot be raised for the first time on seeking court review." (*Id.* at p. 429.) In *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102

Cal.App.4th 656 [125 Cal.Rptr.2d 745], the court held that "[i]f a party wishes to make a particular methodological challenge to a given study relied upon in planning decisions, the challenge must be raised in the course of the administrative proceedings. Otherwise, it cannot be raised in any subsequent judicial proceedings." (*Id.* at p. 686.)

■ General complaints to the administrative agency that certain neighborhoods are not blighted are not sufficient to alert the agency to objections based on the method of data gathering and analysis employed by the writers of the report. Such general complaints do not allow the agency the opportunity to respond and to redress the alleged deficiencies. (See *Fullerton, supra,* 153 Cal.App.3d at p. 1198.) The administrative process does not contemplate that a party to an administrative hearing can make only a " 'skeleton' " showing and thereafter " 'obtain an unlimited trial de novo, on expanded issues, in the reviewing court.' " (*City of Walnut Creek v. County of Contra Costa, supra,* 101 Cal.App.3d at pp. 1019–1020, quoting *Greenblatt v. Munro* (1958) 161 Cal.App.2d 596, 605 [326 P.2d 929].)

We conclude that appellant may not make her arguments here cataloguing alleged deficiencies in the statistics-gathering methods employed by KMA and challenging the analysis of compiled data set forth in the Existing Conditions Report. These arguments go well beyond the scope of any objection raised before the administrative agency; therefore appellant failed to exhaust her administrative remedies with respect to these issues. However, as noted, our review of the record reveals that there were various general objections made during the administrative proceedings to the finding of blight in the SNI Project Area. There were also objections that nonblighted property was improperly included in the SNI Project Area, and that any problems noted in the Report could be alleviated without the necessity for redevelopment. We believe these objections preserve the issue whether the City's finding of blight was supported by substantial evidence in the record. Therefore, while we do not deem it necessary to respond to appellant's in-depth critique of the KMA Report, we have reviewed the record in order to determine whether substantial evidence supports the City's blight findings.

## SUBSTANTIAL EVIDENCE REVIEW

### I. *Standard of Review*

■ The scope of judicial review of an agency's decision to adopt a redevelopment plan is quite limited. Both the trial court and this court review the administrative record to determine whether the findings and decision of the legislative body are supported by substantial evidence. (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco, supra,*

102 Cal.App.4th at p. 674.) In the application of this standard, "[t]he decisions of the agency are . . . given substantial deference and presumed correct." (*Ibid.*) "[T]he reviewing court must resolve reasonable doubts in favor of the administrative findings and determination." (*Ibid.*) And where conflicting inferences can be drawn from the evidence, we accept all reasonable inferences supporting the administrative findings. (*Ibid.*)

## II. *Substantial Evidence of Blight*

 A finding that a project area is blighted is the absolute prerequisite for redevelopment. (*Sweetwater Valley Civic Assn. v. City of National City* (1976) 18 Cal.3d 270, 277 [133 Cal.Rptr. 859, 555 P.2d 1099].) The record reflects that various residents objected, in general terms, to the agency's finding of blight in the SNI Project Area. As we have discussed, while these remarks do not lay the foundation for the extensive and detailed objections to the methodology underlying the KMA Report that appellant raised in the trial court, we believe they justify a brief summary of the evidence supporting the blight findings.

 An area is blighted, within the meaning of the CRL, if it is a "predominantly urbanized" area and the conditions listed in section 33031, subdivision (a) [physical conditions] and subdivision (b) [economic conditions] are so prevalent that the area is underutilized to the extent that it causes a "serious physical and economic burden on the community which cannot reasonably be expected to be reversed or alleviated by private enterprise or governmental action, or both, without redevelopment." (§ 33030, subd. (b).)

Here the KMA firm, which is a qualified consultant in the field of redevelopment, reviewed and analyzed data gathered over a number of months surveying approximately 29,000 parcels in the Project Area. The report first determined that the Project Area met the urbanization criteria, as it contained a substantial number of "subdivided lots of irregular form and shape and inadequate size and usefulness and development that are under multiple ownership." (See § 33320.1.) Further, the Project Area was at the center of San Jose and "encompasse[d] an entirely 'built-out' area developed with a variety of long established commercial, industrial and residential uses." It was therefore considered to be "an integral part of an urbanized area."

In addition to its survey, KMA also researched and evaluated a variety of factors regarding the prevalence of economic blight, and reviewed information regarding infrastructure deficiencies in the Project Area. The surveys and the information gathered varied depending on whether the property was single family/duplex residential, multifamily residential, or commercial/industrial. KMA used its own employees as well as City code

enforcement staff who were specifically dedicated to this work for the Agency. The report provided an extensive record and summary of identified blighting conditions throughout the Project Area, neighborhood by neighborhood and subarea by subarea. Although not every subarea was shown to contain every type of blight set forth in section 33031, it is necessary only that at least one type of physical blight and one type of economic blight is sufficiently prevalent to support a finding that an area is blighted. (§ 33030.)

We note appellant's argument that the KMA report does not constitute substantial evidence because the statistics are based only on exterior surveys. While such surveys have been subject to criticism, this alone is not a basis for invalidating a redevelopment plan. (*Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, 540, fn. 8 [98 Cal.Rptr.2d 334] (*Friends of Mammoth*).) Indeed in several cases, courts have found substantial evidence of blight based on similar surveys. (See *In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 45 [37 Cal.Rptr. 74, 389 P.2d 538]; *Gonzales v. City of Santa Ana, supra,* 12 Cal.App.4th at p. 1345; *Morgan, supra,* 231 Cal.App.3d at p. 256.) "The Community Redevelopment Law does not prescribe a particular methodology." (*Friends of Mammoth, supra,* 82 Cal.App.4th at p. 539, fn. 8.) All that is required is that whatever methods are used result in substantial evidence to document the existence of blight. (*Ibid.*)

We also note the cases relied on by appellant to support her argument that the underlying methodology and analysis in the KMA Report was faulty to a such a degree that it cannot support a finding of blight. (*County of Riverside v. City of Murrieta* (1998) 65 Cal.App.4th 616 [76 Cal.Rptr.2d 606] (*Murrieta*); *Friends of Mammoth, supra,* 82 Cal.App.4th 511; *Beach-Courchesne v. City of Diamond Bar* (2000) 80 Cal.App.4th 388 [95 Cal.Rptr.2d 265] (*Diamond Bar*); *Graber v. City of Upland* (2002) 99 Cal.App.4th 424 [121 Cal.Rptr.2d 649] (*Graber*).) These cases provide precedent for invalidating a redevelopment plan for lack of substantial evidence of blight in the record. However, we do not find them controlling here, for several reasons. In none of these cases was there a question that the objectors had not raised the claims challenging the underlying report during the administrative proceedings. In contrast, our review here is limited by our conclusion that appellant's objections based on the inadequacy of the report's methodology had not been fairly raised for evaluation and resolution by the Agency before it made its decision to adopt the plan. Thus the doctrine of exhaustion of administrative remedies prevents her from raising such issues in the judicial forum.

Furthermore, on their facts the cases of *Murrieta, Friends of Mammoth,* and *Graber* involved largely rural areas where the courts found that there was insufficient evidence that the project area was "predominantly urbanized," a

key finding in the blight analysis. (§ 33030, subd. (b)(1).) Here the SNI Project Area consists of neighborhoods in or near downtown San Jose. There is no question that the Project Area is "predominantly urbanized." (§ 33030, subd. (b)(1).) In *Diamond Bar,* the project area was "an affluent suburban community" "comprised of rolling hills and valleys." (*Diamond Bar, supra,* 80 Cal.App.4th at p. 392.) The city's consultant in that case had acknowledged that conditions of physical blight that often exist in downtown areas of large cities were lacking. (*Diamond Bar, supra,* 80 Cal.App.4th at pp. 398–399.)

In sum, we believe that, in the absence of any specific objections to KMA's qualifications, or to its methods of gathering and analyzing information, respondents could reasonably rely upon the opinions, reasonable inferences, and conclusions contained in the report. The fact that different inferences or conclusions could be drawn, or that different methods of gathering and compiling statistics could have been employed, is not determinative in a substantial evidence review. (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco, supra,* 102 Cal.App.4th at p. 674.)

 *Section 33031, subdivision (a)(1)*—This subdivision describes conditions of "dilapidation and deterioration, defective design or physical construction, faulty or inadequate utilities" or other similar factors, including serious building code violations, that can render buildings unsafe or unhealthy for occupancy. The report used different sets of criteria to document code violations for different types of property. It then analyzed the results of the survey from an overview perspective and on a block by block level. The table of code violations showed a total of 64,338 violations within the Project Area, or 2.1 instances per parcel. Another table showed that 66 percent of the total violations related to deteriorated or inadequate site conditions. A combination of other factors, including incompatible uses, defective building design, substandard design, and vacant buildings and lots, accounted for approximately 13.3 percent of the total code violations. On a block-by-block basis, 13 percent of the blocks with the Project Area were considered "significantly blighted" in that they had incidences of multiple code violations accounting for 50 percent of the block. Eight of the 22 neighborhoods exhibited a prevalence of significantly and substantially blighted areas as related to health and safety building code violations. In addition, the report broke down and identified five conditions characteristic of deterioration and dilapidation, and found a prevalence of one of more of these conditions in 16 percent of the blocks within the Project Area. Furthermore, 25 percent of the blocks in the Project Area were characterized by "[d]efective design or physical construction." Substandard buildings presented health and safety hazards, as described in detail in the report.

██ *Section 33031, subdivision (a)(2)*—These conditions include substandard design, inadequate size, lack of parking and other factors "that prevent or substantially hinder the economically viable use or capacity of buildings or lots." The report included photographs of examples of these conditions, and tables showing the various relevant characteristics. The majority of the buildings in the Project Area were over 30 years old, and more than a third of the buildings were more than 50 years old. While age itself does not equate to blight, the report explained that a prevalence of older buildings is consistent with findings of deterioration, and also inadequate size, one of the prominent characteristics of substandard design. The report analyzed these characteristics with respect to residential, multifamily residential, commercial and industrial buildings in the Project Area. In addition, the survey results showed that five of the six subareas exhibited prevalent parking and circulation deficiencies. All six subareas showed 25 percent or more of their blocks characterized by one or more site deficiencies, such as unpaved or overpaved driveways, improper storage of materials, fence deterioration, broken or missing sidewalks, curbs and gutters, and excessive or deteriorated signage.

*Section 33031, subdivision (a)(3)*—This factor involves "[a]djacent or nearby uses that are incompatible with each other and which prevent the economic development of those parcels or other portions of the project area." As to this factor, KMA limited its analysis to incompatible uses between residential and industrial properties, which the report explained can negatively affect the viability of property in both categories. This occurred in three of the six subareas, contributing to health and safety issues such as noise, odor, fumes and increased traffic volume.

*Section 33031, subdivision (a)(4)*—A common characteristic of blight is that the lots in the area are in multiple ownership and are of an "irregular form and shape and inadequate size," thus inhibiting their utility and potential for development. The KMA report analyzed the lot size of commercial properties in the Project Area and determined that only 28 percent of commercial lots was large enough to support a single-use free standing building. As to industrial properties, more than half of the industrial lots within the Project Area were below standard in size. The report also identified the number and location of inadequately sized residential parcels, and multifamily residential parcels. In four of the six subareas, over half of the multifamily lots were inadequately sized. The report explained that small parcels not only result in blighting conditions but also are a constraint for investment and development.

*Section 33031, subdivision (b)(1)*—Subdivision (b) of section 33031 sets forth economic conditions that cause blight. Here KMA studied and analyzed

available data regarding market trends and property values. Subdivision (b)(1) provides that "[d]epreciated or stagnant property values" are a condition of economic blight. The report summarized the residential, commercial and industrial property sale prices, building permit activity, business closure activity and retail sales within the Project Area, and determined that the growth rate in all six sub-areas of the Project Area was significantly lower than the City-wide average. Sales prices in the Project Area were lower than in the City and county. The Project Area's contribution to the overall assessed value of the City had declined over the previous five years. Per capita, the City was significantly higher in assessed value than the Project Area.

*Section 33031, subdivision (b)(2)*—This factor concerns the prevalence of business vacancies, low lease rates, high turnover rates, abandoned buildings, or excessive numbers of vacant lots. KMA determined that the Project Area contained a significantly lower amount of business license activity compared with the City as a whole. In three of the six subareas the total number of business licenses issued in the previous five years had decreased. The Project Area as a whole had an increase of 22 percent in business closures, while in the City as a whole business closures decreased substantially.

*Section 33031, subdivision (b)(3)*—This factor, "[a] lack of necessary commercial facilities that are normally found in neighborhoods," is not separately identified or analyzed in the report. However a finding of blight need not be supported by evidence of each statutory factor. All that is needed is one or more factors from section 33031, subdivision (a), and one or more from section 33031, subdivision (b). (§ 33030, subd. (b)(2).)

*Section 33031, subdivision (b)(4)*—"Residential overcrowding or an excess of bars, liquor stores, or other businesses that cater exclusively to adults . . . ." The report concluded, based on an analysis of census data, that "[r]esidential overcrowding is a significant problem in the Project Area." Almost 30 percent of the occupied housing units in the Project Area would be considered overcrowded, compared with 11 percent City-wide.

*Section 33031, subdivision (b)(5)*—This last factor is a "high crime rate that constitutes a serious threat to the public safety and welfare." The report analyzed statistics obtained from law enforcement agencies and concluded that "the overall rates of crime occurrence [in the Project Area] significantly exceed the citywide average, both by non-contiguous sub-area, as well as by neighborhood." As to "violent crimes," the Project Area, which contained 29 percent of the City's population, reported 47 percent of the violent crimes.

*Section 33030, subdivision (c)*—In addition to the statutory factors listed in section 33031, subdivisions (a) and (b), the CRL provides that a blighted

area can be one characterized by "the existence of inadequate public improvements, parking facilities, or utilities." (§ 33030, subd. (c).) The report identified "numerous parking and circulation deficiencies" in the Project Area, which contributed to a lack of on-street parking. The report also set forth the general location and type of inadequate public improvements, including deteriorated street, storm sewer and sanitary sewer systems.

The report compiled various tables listing all of the blighting conditions identified in the Project Area, their location through the Project Area, and which conditions were found to be prevalent in which neighborhoods and subareas of the Project Area. These tables show that all six subareas meet the statutory criteria for a blighted area. We conclude that the report supplied substantial evidence for the City's finding of blight in the SNI Project Area under the statutory criteria.

### III. Inclusion of Nonblighted Areas in the SNI Development Project Area

The record shows that there were various objections raised during the administrative hearing that the Naglee Park neighborhood was not a blighted area. Many residents in the Naglee Park area objected to a finding characterizing their neighborhood as "blighted." They pointed out that there was considerable pride of ownership and a strong sense of community in their neighborhood, and that the high price of the homes in this neighborhood was inconsistent with a finding of blight. Some requested that Naglee Park be removed from the SNI Project Area because it was not blighted.

Both the Existing Conditions Report and the City's written responses to objections addressed these concerns. The report noted that Naglee Park was largely residential and contained some "large well-maintained homes." The report went on to explain that "[t]he Naglee Park area has been included because it is part of the larger University area, is surrounded by the proposed Project Area and will be in a coordinated public improvement program for the University area. Furthermore, improvement of the declining surrounding neighborhoods will have a positive effect on maintaining the sound character of the Naglee Park area." The report also pointed out that the Naglee Park neighborhood is not itself a "project area." Rather, it is part of a neighborhood, which in turn is within one of six larger noncontiguous subareas that form the entire SNI Redevelopment Project Area. The determination of blight, pursuant to the requirements of sections 33030 and 33031, is made with respect to the entire subarea.

Section 33321 provides that a project area may include properties or areas that are not blighted "but whose inclusion is found necessary for the

effective redevelopment of the area of which they are a part." In its responses to the citizens objecting to its inclusion in the project area, the City explained that Naglee Park was surrounded by blighted area. It was just one part of the University Neighborhood, which was one of 10 different neighborhoods in the south-east subarea of the SNI Project Area. "The South-East sub-area is characterized by the following blighting conditions: building code violations, substandard design/buildings of inadequate size, inadequately sized/irregularly shaped parcels, lack of parking/poor vehicle circulation, poor site conditions, depreciated or stagnant property values or impaired investment, a higher percentage increase in new business closures as compared to the City of San Jose, residential overcrowding, and a high crime rate." The City determined that because of the prevalence of blighting conditions in the entire subarea, the Naglee Park area was "impacted by blight." This is supported by the evidence contained in the Existing Conditions Report. It provided a statistical showing that even including Naglee Park, the University neighborhood was characterized by home sales 30 percent below the county-wide median and by a relatively high percentage of households with a very low annual income. Deterioration was prevalent in 22 percent of all the blocks in the University neighborhood, and poor site conditions, in 83 percent of all blocks. Parking was a prevalent problem in more than half of all of the blocks within the University neighborhood.

■ An agency's decision to include a nonblighted property or properties within a redevelopment project area is reviewed under an abuse of discretion standard. (See *In re Redevelopment Plan for Bunker Hill, supra,* 61 Cal.2d at p. 50.) ■ Here there is evidence to support a finding that the Naglee Park is within a blighted area. The types of projects and remediation contemplated by the SNI Redevelopment Plan include infrastructure improvements, streetscapes, traffic "calming," transit and parking improvement projects, and historic preservation programs, among others. These projects necessarily involve the entire neighborhood or sub-area of which Naglee Park is a part. Naglee Park will therefore be in a coordinated public improvement program for the University neighborhood. Under the circumstances we find there was evidence in the record that it was necessary to the redevelopment plan to include Naglee Park in the project area, and thus there was no abuse of discretion.[3]

## IV. *Necessity for Redevelopment*

Other complaints raised during the proceedings, and thus preserved for appeal, were that the blighting conditions cited in the report could be

---

[3] Appellant also contends that there was no evidence to support inclusion of the Hoffman/Via Monte commercial area with the Project Area. However, we do not find that any objections were raised regarding this area during the administrative proceedings.

remedied through governmental action, or by the private sector, without the need for redevelopment. Both the City's written responses to objections and the report itself addressed this complaint. They explained that the blighting conditions existing in the Project Area could not reasonably be alleviated by private enterprise because there was "little incentive for the private sector to invest in most portions of the Project Area" due to a variety of risk factors set forth in the report, including "stagnant assessed values, low property sales transaction[s], lower retail sales, and a high rate of business closures." Therefore the projected financial return on investment was not sufficiently strong to attract investors. The lack of adequately sized parcels also contributed to discouraging private development. Aggregation of smaller parcels would require the assistance of the public sector and the Agency.

Furthermore, government action by itself could not reverse all of the conditions causing blight because resources and funds available for neighborhood improvements "are small relative to the magnitude of the Project Area needs." Federal funds were also limited. And "assessment districts are not considered a viable alternative" because of the "larger percentage of low-income families and the net increase in business closures." "As indicated by the extensive ongoing planning and community consultation efforts, there are considerable needs in the SNI neighborhoods. The City's existing general fund and community development block grants resources are insufficient to address the over $100 million in improvements needed in the Project Area in the next five years alone. Redevelopment is being pursued as one resource to assist in the revitalization of the residential neighborhoods."

We believe the record adequately addressed the necessity for redevelopment in the Project Area to alleviate the conditions of blight.

### INJUNCTIVE AND DECLARATORY RELIEF

Appellant contends that the court erred in denying her request for injunctive relief to restrain the illegal expenditure of public funds by respondents. We review the trial court's decision for abuse of discretion. (*Rotary Club of Duarte v. Board of Directors* (1986) 178 Cal.App.3d 1035, 1066 [224 Cal.Rptr. 213].) This action was brought as a validation action under Code of Civil Procedure section 860 et seq., as provided by the CRL. Appellant's prayer for injunctive and declaratory relief within this action depends entirely upon her success in establishing the invalidity of the SNI Redevelopment Plan. Since the judgment, which we affirm here, was in favor of the City and the Agency validating the SNI Redevelopment Plan, appellant's claim for injunctive relief must also fail. We find no abuse of discretion.

## DISPOSITION

The judgment is affirmed.

Mihara, J., and McAdams, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 27, 2005.