Filed 2/18/16  Save Sunnyvale Parks & Schools v. City of Sunnyvale CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SAVE SUNNYVALE PARKS & SCHOOLS, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF SUNNYVALE, et al., <br><br> Defendants and Respondents. | H041462 <br> (Santa Clara County <br> Super. Ct. No. 1-14-CV-258694) |

In this proceeding, Save Sunnyvale Parks & Schools, Inc. (Save Sunnyvale), a nonprofit public benefit corporation, challenges the sale of Raynor Activity Center (RAC) by the City of Sunnyvale (City) to Stratford Schools, Inc. (Stratford), a private school, and a concomitant joint use agreement between the City and Stratford.

In its "First Amended Verified Petition" filed January 17, 2014 (petition), Save Sunnyvale sought a writ of mandate to compel the City, its city council (Council), and Stratford to "[r]escind, void, and annul" the following agreements:  (1) the "Exclusive Purchase and Sale Agreement of Surplus City Real Property" (Sale Agreement) and (2) the "Joint Use Agreement Between City of Sunnyvale and Stratford School, Inc. for Recreation Purposes of the Raynor Park Recreation Areas" (JU Agreement).  The petition charged that (1) the Council approved the Sale Agreement and the JU Agreement without first complying with the California Environmental Quality Act (CEQA) (Public

Resources Code, § 21000 et seq.)[1] (first cause of action) and (2) the City and Council violated the Public Park Preservation Act of 1971 (Park Act) (Pub. Resources Code, §§ 5400-5409) (second cause of action).  It sought to prevent the City, the Council, and Stratford from taking any further actions or issuing any further approvals with respect to those agreements and to compel compliance with CEQA and the Park Act in the future.

The trial court sustained the City's demurrer to the second cause of action for alleged violation of the Park Act without leave to amend on the ground that, as a matter of law, the act did not apply to a charter city like the City.  Following a subsequent hearing on the first cause of action for failure to comply with CEQA, the trial court concluded that Save Sunnyvale's CEQA claim was barred because it had not satisfied the issue exhaustion requirement of section 21177, subdivision (a).  Judgment was entered against Save Sunnyvale, which has appealed.

Save Sunnyvale now argues that it either satisfied, or was excused from satisfying, the issue exhaustion requirement of section 21177, subdivision (a), and that the City violated CEQA by postponing CEQA compliance until after its approval of the Sale Agreement and of the JU Agreement.  It asserts that the Council's approval of those agreements without prior CEQA review contravenes *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116 (*Save Tara*), which held that "before conducting CEQA review, agencies must not 'take any action' that significantly furthers a project 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project.'  [Citations.]"  (*Id.* at p. 138.)  In addition, Save Sunnyvale claims that the City was bound by the Park Act even though it was a charter city and that the trial court erred in sustaining the demurrer to its second cause of action without leave to amend.

---

[1] All further statutory references are to the Public Resources Code unless otherwise stated.

We find the trial court did not err and affirm.

I

*Background*

A staff report prepared for the November 19, 2013 council meeting stated: "Raynor Activity Center (RAC) is currently an underutilized City asset that is not being used to deliver City services. It comprises 3.5 acres of the larger 14.7 acre parcel that was purchased by the City in 1979 from the Santa Clara Unified School District. After considering proposals for the long-term lease of RAC, City Council declared RAC as surplus property in May of 2012 and directed staff to conduct a competitive process for its sale." The report clarified that "[o]nly the Activity Center (former school buildings) that includes 22 classrooms in eight buildings and adjacent parking lots (approximately 3.5 acres) are for sale."

According to the staff report, the City received five proposals for the purchase of RAC[2] and evaluated them based on specified criteria. "After reviewing [the] proposals, [the] City Council authorized staff to enter negotiations with Stratford School." Stratford was proposing "to renovate the existing buildings at the RAC and use them for a private school." The negotiations between the City's staff and Stratford had resulted in a proposed agreement to sell the property at a purchase price of $14,050,000.

The report further indicated that a condition of the proposed sale required the parties to enter into a joint use agreement as to the "use of a portion of Raynor Park athletic fields for physical education and after-school sports programs." "The City owns and maintains the Raynor Park open space . . . as part of the parks system and it is operated as part of the City's recreational programs. The City's recreational program is

---

[2] Those proposals were from Fremont Union High School District, German International School of Silicon Valley, Los Altos School District, Morgan Autism Center, and Stratford School Incorporated.

managed on a reservation fee based system for the benefit of organized sports teams and the public in general." The report stated that the proposed joint use agreement before the Council for consideration on November 19, 2013 would give Stratford priority use of certain areas of Raynor Park open space during school hours and after school on certain days.

The proposed sale agreement, which was attached to the staff report, conditioned the sale of the RAC property upon (1) Stratford obtaining a conditional use permit from the City for renovation and use of the property as a private school, (2) the City recording a parcel map depicting that property as a separate legal lot, and (3) the parties entering into a joint use agreement regarding the use of the recreational fields and the construction and use of a basketball court on the City's adjacent property. The proposed joint use agreement was also attached to the report. The proposed sale agreement required the City to "timely process the Use Permit" and to "include environmental analysis under the California Environmental Quality Act (CEQA)" as part of the permitting process. It stated that "[r]easonable conditions may be placed upon the Property or use to enhance the project and/or reduce effects on surrounding properties and the environment."

Following a public hearing at the November 19, 2013 council meeting, the Council passed a motion authorizing the city manager to execute the Sale Agreement and directed that, upon close of escrow, the proceeds from the sale would be applied to designated purposes, including, among other purposes, the funding of a new branch library and a pool expansion project. The Council found that the Sale Agreement was not a project under CEQA, and it directed staff to conduct environmental analysis as part of the use permit process. The Council did not authorize the city manager to execute the proposed joint use agreement but, rather, passed a separate motion directing the City's staff to renegotiate with Stratford.

The staff report prepared for the December 3, 2013 council meeting indicated that the staff had renegotiated the joint use agreement with Stratford and that Stratford had

4

agreed to certain concessions. It stated that "[f]urther negotiations with Stratford School [had] resulted in a reduction to priority use hours and a reduction in the size of the field use area that ensures continuous access through Raynor Park for other park users." The staff recommended that the Council authorize the city manager to execute the proposed joint use agreement as revised. The proposed joint use agreement as revised was attached to the report.

Following a public hearing at the December 3, 2013 council meeting, the Council passed a motion authorizing the city manager to execute the JU Agreement between the City and Stratford.

II

*Demurrer to Second Cause of Action Alleging Violation of Park Act*

A. *Background*

On May 2, 2014, the trial court sustained the City's demurrer to the second cause of action on the ground that the petition failed to state a cause of action (Code Civ. Proc., § 430.10, subd. (e)). It determined that, as a matter of law, the Park Act did not apply to a charter city. The trial court additionally determined that section 5401, subdivision (a), of the Park Act did not apply as a matter of law because the property at issue was not in use as a public park when the City acquired it from Santa Clara Unified School District in 1979.[3] The court denied leave to amend because the defects could not be cured through amendment.

---

[3] Section 5401, subdivision (a), states: "No city, city and county, county, public district, or agency of the state, including any division, department or agency of the state government, or public utility, shall acquire (by purchase, exchange, condemnation, or otherwise) any real property, which property is in use as a public park at the time of such acquisition, for the purpose of utilizing such property for any nonpark purpose, unless the acquiring entity pays or transfers to the legislative body of the entity operating the park sufficient compensation or land, or both, as required by the provisions of this chapter to enable the operating entity to replace the park land and the facilities thereon."

5

B. *Standard of Review*

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

C. *Park Act Not Applicable to a Charter City*

The petition alleged in the second cause of action that, "[i]n violation of [section] 5401(a), the City has not paid or transferred to the . . . legislative body of the entity operating Raynor Park, sufficient compensation or land or both as required by the provisions of the [Park Act] to enable the City as operating entity of Raynor Park to replace the parkland and facilities thereon, but [the City] has instead declared its intention to use all the proceeds of the sale of [RAC] [for] purposes other than such replacement." It further alleged that the City and the Council had a duty to comply with section 5407, which requires in relevant part that "all funds, or land and funds received by the operating entity shall be used to obtain or provide substitute park land and facilities in accordance with the provisions of Section 5407.1 or Section 5407.2." (See §§ 5400.6 ["As used in this chapter 'operating entity' means the entity owning the park land and the facilities thereon."]; 5404 ["In the event that the park land and facilities are acquired, the operating entity shall acquire substitute park land and facilities. . . ."]; 5407.1 [as general rule,

6

"substitute park land and facilities shall be of comparable characteristics and of substantially equal size located in an area which would allow for use of the substitute park land and facilities by generally the same persons who used the acquired park land and facilities"]; 5407.2 [grounds and procedure for changing general location of the substitute park land and facilities].)

Save Sunnyvale maintains that the Park Act addresses a matter of "statewide concern" and, therefore, the act governs the City even though it is a charter city. It also contends that "changed conditions, both factual (the massive urbanization of the entire state), and legal (the Legislature's laws responding to over-consumption of the state's land resource by this urbanization) have made preservation of public parks . . . a matter of 'statewide concern.' " We are not persuaded.

Cities are classified as either "chartered cities" or "general law cities." (Gov. Code, §§ 34100-34102.) "Charter cities are specifically authorized by our state Constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs. Article XI, section 5, subdivision (a) of the California Constitution provides: 'It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations *in respect to municipal affairs,* subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and *with respect to municipal affairs* shall supersede all laws inconsistent therewith.' (Italics added.)"[4] (*State Bldg. and Const. Trades Council of Cal., AFL-CIO v. City of Vista*

_____

[4] The City's charter provides in part: "The City shall have the power to make and enforce all laws and regulations in respect to municipal affairs, subject only to such restrictions and limitations as may be provided in this Charter and in the Constitution of the State of California." (Charter of City of Sunnyvale, art. IV, § 400.) Sunnyvale Municipal Code section 2.07.030, subdivision (a), provides that "[t]he city council shall (continued)

7

(2012) 54 Cal.4th 547, 555 (*State Bldg*.).) This constitutional provision is "commonly referred to as the 'home rule' doctrine." (*O'Connell v. City of Stockton* (2007) 41 Cal.4th 1061, 1077.)

A charter city's "charter provisions, ordinances or regulations 'relating to matters which are purely "municipal affairs" ' prevail over state laws covering the same subject. [Citations.]" (*Baggett v. Gates* (1982) 32 Cal.3d 128, 136.) But "as to matters of statewide concern, charter cities remain subject to state law. (*Bishop v. City of San Jose* (1969) 1 Cal.3d 56, 61-62.)" (*Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 315-316.)

"[T]he constitutional concept of municipal affairs is not a fixed or static quantity. It changes with the changing conditions upon which it is to operate. What may at one time have been a matter of local concern may at a later time become a matter of state concern controlled by the general laws of the state. [Citations.]" (*Pacific Tel. & Tel. Co. v. City & Cty. of San Francisco* (1959) 51 Cal.2d 766, 771.) "Some portions of a local matter may ultimately become of general state interest. [Citation.]" (*Weekes v. City of Oakland* (1978) 21 Cal.3d 386, 423.)

"In [*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991)] 54 Cal.3d 1, [the California Supreme Court] set forth an analytical framework for resolving whether or not a matter falls within the home rule authority of charter cities. First, a court must determine whether the city ordinance at issue regulates an activity that can be characterized as a 'municipal affair.' (*Id.* at p. 16.) Second, the court 'must satisfy itself that the case presents an actual conflict between [local and state law].' (*Ibid.*) Third, the court must decide whether the state law addresses a matter of 'statewide concern.' (*Id.* at p. 17.) Finally, the court must determine whether the law is 'reasonably related to . . .

be the awarding authority for all purchases, sales or leases of real property for the city where the purchase or sales price or lease cost exceeds seventy-five thousand dollars."

8

resolution' of that concern (*ibid*.) and 'narrowly tailored' to avoid unnecessary interference in local governance (*id*. at p. 24). 'If . . . the court is persuaded that the subject of the state statute is one of statewide concern and that the statute is reasonably related to its resolution [and not unduly broad in its sweep], then the conflicting charter city measure ceases to be a "municipal affair" pro tanto and the Legislature is not prohibited by article XI, section 5(a), from addressing the statewide dimension by its own tailored enactments.' (*Id*. at p. 17.)" (*State Bldg*., *supra*, 54 Cal.4th at p. 556.)

"[T]he question whether in a particular case the home rule provisions of the California Constitution bar the application of state law to charter cities turns ultimately on the meaning and scope of the state law in question and the relevant state constitutional provisions. Interpreting that law and those provisions presents a legal question, not a factual one. [Citations.] Courts accord great weight to the factual record that the Legislature has compiled [citations], and also to any relevant facts established in trial court proceedings. [Citation.] Factual findings by the Legislature or the trial court, however, are not controlling. [Citation.] The decision as to what areas of governance are municipal concerns and what are statewide concerns is ultimately a legal one." (*State Bldg*., *supra*, 54 Cal.4th at p. 558.)

We now consider whether the Park Act addresses a matter of statewide concern. The Park Act was enacted in 1971 (Stats. 1971, ch. 1642, § 1, pp. 3544-3547.) In 1975, section 5401 of the act was amended to add subdivision (b).[5] (See Stats.1975, ch. 433, § 1, p. 931.) The act does not expressly state that its provisions apply to charter cities or address a matter of statewide concern.

---

[5] Section 5401, subdivision (b), provides: "Where the operating entity and the acquiring entity are one and the same, the entity is subject to the provisions of this chapter pertaining to both operating and acquiring entities . . . ."

9

In *Simons v. City of Los Angeles* (1976) 63 Cal.App.3d 455 (*Simons*) it was determined that the Park Act did not apply to the City of Los Angeles, a charter city. The plaintiffs in that case challenged an "order sustaining without leave to amend a general demurrer to their complaint requesting the court to declare section 172 of the Los Angeles City Charter . . . transferring 21.464 acres of Elysian Park to the department of public works . . . for use for police training and facilities invalid." (*Simons*, *supra*, at p. 459.) They "contend[ed] that the provisions of the Park Act have preempted the field as to the transfer of public park land for any nonpark use and render null and void any transfer which fails to comply with its requirements." (*Id*. at p. 466.)

The appellate court in *Simons* concluded "the Park Act does not alter the common law concept that park regulation is a municipal affair, and it cannot, therefore, be said that the state has preempted the field in this area." (*Simons*, *supra*, 63 Cal.App.3d at p. 467.) It stated: "A charter city has inherent authority to control, govern and supervise its own parks. '[The] disposition and use of park lands is a municipal affair (*Wiley v. City of Berkeley* [(1955)] 136 Cal.App.2d 10; *Mallon v. City of Long Beach* [(1955)] 44 Cal.2d 199), and a charter city "has plenary powers with respect to municipal affairs not expressly forbidden to it by the state Constitution or the terms of the charter." (*City of Redondo Beach v. Taxpayers, Property Owners etc. City of Redondo Beach* [(1960)] 54 Cal.2d 126, 137.) Not only must any limitations on municipal power be express, they must be *clear and explicit*, and no restriction on the exercise of municipal power may be implied. "The former guide—that municipalities have only the powers conferred and those necessarily incident thereto [citation]—is inapplicable." [Citation.]' (Italics in original.) (*Hiller v. City of Los Angeles* (1961) 197 Cal.App.2d 685, 689.) [¶] Accordingly, it is permissible for a city to build a courthouse in a public park since the city ' "may deal with such a park to which it holds title in fee, as it sees fit, subject only to the limitations and restrictions of its own charter. If the charter is silent on the matter of abandonment or change in use of such park, that power nevertheless inheres in

such a municipality." ' (*City of Marysville v. Boyd* (1960) 181 Cal.App.2d 755, 757.) The only exception to this rule is the acquisition of park land by dedication by private deed. (*Slavich v. Hamilton* (1927) 201 Cal. 299, 303.)" (*Id.* at p. 468.)

Save Sunnyvale does not dispute the historical treatment of parks as a municipal affair. In *Wiley v. City of Berkeley*, *supra*, 136 Cal.App.2d 10 (*Wiley*), the plaintiff sought to enjoin the City of Berkeley from using a public park as a site for a firehouse. (*Id.* at p. 11.) The plaintiff appealed from a judgment entered after an order sustaining a demurrer without leave to amend. (*Ibid.*) The complaint indicated that the city had acquired the property by its exercise of the right of eminent domain for use as a public park pursuant to the Park and Playground Act of 1909. (*Wiley*, *supra*, at pp. 11-12.) On appeal, the plaintiff "contended that the Legislature has provided the means by which lands acquired under the Park and Playground Act of 1909 may be abandoned, and that the city of Berkeley cannot abandon this land for park use without following the procedure outlined in Government Code, sections 38400-38462." (*Id.* at p. 16.) The appellate court determined that the matter fell "within the field of municipal affairs rather than an affair of statewide interest, and Berkeley by its charter ha[d] availed itself of full power in this field under [former] section 6 of article XI of the California Constitution." (*Id.* at p. 16-17.) It concluded that "[s]ince the matter is, then, a municipal affair, it would seem that the city may deal with such a park to which it holds title in fee, as it sees fit, subject only to the limitations and restrictions of its own charter." (*Id.* at p. 14.)

Save Sunnyvale nevertheless asserts that, by the time the Park Act was passed in 1971, the preservation of public parks had evolved from being a matter of local concern to being a matter of statewide concern. It also maintains that *Simons* is not controlling because it failed to consider whether preservation of public parks had become a matter of statewide concern by the time the Park Act was enacted.

A number of California cases have cited *Simons* in recognizing that public parks are a municipal affair. (See *Save Our Heritage Organisation v. City of San Diego* (2015)

11

237 Cal.App.4th 163, 190; *People v. Stone* (1987) 190 Cal.App.3d Supp. 1, 12; *People v. Trantham* (1984) 161 Cal.App.3d Supp. 1, 13-14; *People v. Shepherd* (1977) 74 Cal.App.3d 334, 340-341.) The Legislature has now had decades to amend the Park Act if it disagreed with *Simons* and considered the general preservation of public parks to be a matter of statewide concern. While legislative inaction after a judicial decision does not necessarily imply legislative agreement (see *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1156 (*Harris*); *County of Los Angeles v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 391, 404), courts "generally presume the Legislature is aware of appellate court decisions. (*Viking Pools, Inc. v. Maloney* (1989) 48 Cal.3d 602, 609; *Estate of McDill* (1975) 14 Cal.3d 831, 839.)" (*Harris, supra,* at pp. 1155-1156.)

The Legislature's failure to amend the Park Act to abrogate *Simons* may signify legislative agreement with *Simons*. (See *Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1156.) The Legislature knows how to expressly declare that a matter is of statewide concern or that a law applies to charter cities. (See e.g. Gov. Code, § 65850.55, subd. (a)(1) ["[O]versight of permitting fees for solar energy systems is a matter of statewide concern and not a municipal affair, as that term is used in Section 5 of Article XI of the California Constitution" and "[t]herefore this act shall apply to all cities, including charter cities."]; Gov. Code, § 65913.9 ["[T]he development of a sufficient supply of housing to meet the needs of all Californians is a matter of statewide concern" and "[t]his chapter shall apply to all cities, including charter cities . . . ."]; Water Code, § 9624 ["[F]lood protection in the Sacramento-San Joaquin Valley is a matter of statewide concern and not a municipal affair as that term is used in Section 5 of Article XI of the California Constitution" and the Central Valley Flood Protection Act of 2008 applies to charter cities included in the Central Valley Flood Protection Plan].)

We remain cognizant, however, that "the determination of what constitutes a municipal affair (over which the state has no legislative authority) and what constitutes a statewide concern (as to which state law is controlling) is a matter for the courts, not the

12

Legislature, to decide. [Citation.]" (*State Bldg.*, *supra*, 54 Cal.4th at p. 562.) "[T]he Legislature is empowered neither to determine what constitutes a municipal affair nor to change such an affair into a matter of statewide concern." (*Bishop v. City of San Jose*, *supra*, 1 Cal.3d at p. 63, fn. omitted.) "[The fact] that the Legislature chose to deal with a problem on a statewide basis, . . . does not in itself make the problem a statewide concern. [Citation.] Put differently, the concept of statewide concern is not coextensive with the state's police power." (*State Bldg.*, *supra*, at p. 562.)

In support of its thesis, Save Sunnyvale asserts that "de facto" and the "de jure" changes had occurred in California by the time the Park Act was passed in 1971. With respect to changes in circumstances, Save Sunnyvale points to the general urbanization of California.[6] With respect to changes of law, Save Sunnyvale focuses on three statutes enacted in 1970: Government Code section 65560 et seq. (Open Space Lands Act) (Stats. 1970, ch. 1590, § 15, pp. 3314-3317); the legislation creating the State Office of Planning and Research (Stats. 1970, ch. 1534, § 2, pp. 3097-3101); and CEQA (Stats. 1970, ch. 1433, § 1, pp. 2780-2783).

"In 1970 the Legislature enacted comprehensive legislation directed to the preservation of open-space lands within the state. (Gov. Code, § 65560 et seq.)" (*Furey v. City of Sacramento* (1979) 24 Cal.3d 862, 867.) As enacted, former Government Code section 65563 provided that "[e]very city and county shall, by June 30, 1972, prepare and adopt a local open-space plan for the comprehensive and long-range preservation and conservation of open-space land within its jurisdiction." (Stats. 1970, ch. 1590, § 15, p. 3316.) "Local open-space plan" was defined as "the open-space element of a county or city general plan adopted by the board or council." (Stats. 1970, ch. 1590, § 15, p. 3315 [former § 65560, subd. (b)].) As enacted, Government Code section 65566

---

[6] We deny Save Sunnyvale's request for judicial notice of a 1906 map of the "Bay Counties" prepared by Punnett Brothers.

provided, and it continues to provide: "Any action by a county or city by which open-space land or any interest therein is acquired or disposed of or its use restricted or regulated, whether or not pursuant to this part, must be consistent with the local open-space plan." (Stats. 1970, ch. 1590, § 15, p. 3316.)

The Open Space Lands Act included legislative findings and declarations that indicated, among other things, that it was "necessary to provide for the development by the state, regional agencies, counties and cities, *including charter cities*, of statewide coordinated plans for the conservation and preservation of open-space lands." (Stats. 1970, ch. 1590, § 15, p. 3316, italics added; see Gov. Code, § 65561, subd. (d).) In Government Code section 65562, the Legislature explained: "It is the intent of the Legislature in enacting this article: [¶] (a) To assure that cities and counties recognize that open-space land is a limited and valuable resource which must be conserved wherever possible. [¶] (b) To assure that every city and county will prepare and carry out open-space plans which, along with state and regional open-space plans, will accomplish the objectives of a comprehensive open-space program." (Stats. 1970, ch. 1590, § 15, p. 3316.) The Legislature also found and declared, among other things, that "the preservation of open-space land, as defined in this article, is necessary not only for the maintenance of the economy of the state, but also for the assurance of the continued availability of land for the production of food and fiber, for the enjoyment of scenic beauty, for recreation and for the use of natural resources." (Stats.1970, ch. 1590, § 15, p. 3315; see Gov. Code, § 65561, subd. (a).)

As enacted in 1970, the Open-Space Lands Act did not specifically mention parks. "Open-space land" was defined as "any parcel or area of land or water which is *essentially unimproved* and devoted to an open space use as . . . defined, and which is designated in a local, regional or state open-space plan" as natural resource land, agricultural land, recreation land, scenic land, watershed or ground water recharge land,

14

or wildlife habitat as those terms were statutorily defined.[7] (Stats. 1970, ch. 1590, § 15, p. 3315 [former Gov. Code, § 65560, subd. (d)], italics added.)

In 1972, after the Park Act was enacted, the Legislature repealed former Government Code section 65560 and replaced it with a new section. (Stats. 1972, ch. 251, §§ 1.5, 2, p. 501.) The newly enacted section recognized various types of open space, including "[o]pen space for outdoor recreation," which it described as including, among other areas, "areas particularly suited for park and recreation purposes." (Stats. 1972, ch. 251, § 2, p. 501; see Gov. Code, § 65560, subd. (b)(3).) But Government Code section 65560 still defined "[o]pen-space land" as "any parcel or area of land or water which is *essentially unimproved* and devoted to an open-space use as defined in this section, and which is designated on a local, regional or state open-space plan" as open space for an enumerated purpose. (Stats. 1972, ch. 251, § 2, p. 501, italics added; see Gov. Code, § 65560, subd. (b).) Thus, the Open Space Lands Act, as enacted in 1970 or amended in 1972, did not signal that the Legislature considered the general preservation of public parks, regardless of the extent of improvements on the park land or whether the land fell within the statutory definition of open-space land, to be a matter of statewide concern.

In 1970, the Legislature established the State Office of Planning and Research. (Stats. 1970, ch. 1534, § 2, p. 3097 [Gov.Code § 65037].) It was authorized to serve "the Governor and his [or her] Cabinet as staff for long-range planning and research, and constitute the comprehensive state planning agency." (Stats. 1970, ch. 1534, § 2, p. 3098 [Gov.Code § 65040].) Part of its mandate was to help develop long-term goals and

_____

[7] "Open-space use" included the use of land for public recreation. (Stats. 1970, ch. 1590, § 15, p. 3315 [former Gov. Code, § 65560, subd. (e)].) "Recreation land" was further defined as "any area of land or water designated on the state, or any regional or local open-space plan as open-space land and which is actively used for recreation purposes and open to the public for such purposes with or without charge." (Stats. 1979, ch. 1590, § 15, p. 3315 [former Gov. Code, § 65560, subd. (f)].)

policies for land use and protection of the state's environment.  (Stats. 1970, ch. 1534, § 2, pp. 3098-3099 [Gov. Code § 65040]; see Stats. 1970, ch. 1534, §§ 2, 4, pp. 3096-3097, 3101.)  In enacting the legislation concerning the State Office of Planning and Research, the Legislature declared that "future growth of the state should be guided by an effective planning process and should proceed within the framework of officially approved statewide goals and policies directed to land use, population growth and distribution, urban expansion and other relevant physical, social and economic development factors."  (Stats. 1970, ch. 1534, § 2, p. 3096 [former Gov. Code, § 65030].)  The Legislature did not declare that "California's land is an exhaustible resource" in 1970 as claimed by Save Sunnyvale.  That declaration was not made until 1976, after the Park Act was enacted, when the Legislature added the current Government Code section 65030.[8]  (Stats.1976, ch. 1386, § 4, p. 6282.)  In any event, the legislation establishing the State Office of Planning and Research was aimed at the development of long-term state policy and planning and did not indicate that the Legislature considered the general preservation of public parks to be a matter of statewide concern.

In 1970, the Legislature also enacted CEQA, which was intended to "[e]nsure that the long-term protection of the environment shall be the guiding criterion in public decisions."  (Stats. 1970, ch. 1433, § 1, p. 2781 [former Pub. Resources Code, § 21001, subd. (d)].)  The Legislature found and declared, among other things, that "[t]he maintenance of a quality environment for the people of this state now and in the future is *a matter of statewide concern.*"  (Stats. 1970, ch. 1433, § 1, p. 2780, italics added [Pub. Resources Code, § 21000, subd. (a)].)  "When the Legislature enacted CEQA in

_____

[8] Government Code section 65030 now recognizes that "California's land is an exhaustible resource" and states that "[i]t is the policy of the state and the intent of the Legislature to protect California's land resource, to insure its preservation and use in ways which are economically and socially desirable in an attempt to improve the quality of life in California."

16

1970, it directed the Governor's Office of Planning and Research . . . , 'in conjunction with appropriate state, regional, and local agencies,' to 'coordinate the development of objectives, criteria, and procedures to assure the orderly preparation and evaluation of' EIRs. (Former § 21103, added by Stats. 1970, ch. 1433, § 1, pp. 2780, 2782.)" (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1100 (*Berkeley Hillside*).)

While a project that involves the conversion of public park land to another use may be subject to environmental review under CEQA, neither CEQA nor the other cited statutory schemes enacted in 1970 demonstrate that the general preservation of public parks had become a matter of statewide concern by the time the Legislature enacted the Park Act in 1971. The general urbanization of California before and after the passage of the Park Act and the passage of the statutory schemes relied upon by Save Sunnyvale do not demonstrate that the general preservation of public parks has become a matter of statewide concern.

Save Sunnyvale's reliance upon *City of Los Angeles v. State of California* (1982) 138 Cal.App.3d 526 (*City of Los Angeles*) is misplaced. In that case, an appellate court reviewed a lower court's determination that Government Code section 65860, subdivision (d), was "unconstitutional on its face." (*City of Los Angeles*, *supra*, at p. 529.) Government Code section 65860, subdivision (a), mandates that "[c]ounty or city zoning ordinances . . . be consistent with the general plan of the county or city by January 1, 1974." (See *City of Los Angeles*, *supra*, at p. 531.) Subdivision (d) of Government Code section 65860 states that "[n]otwithstanding Section 65803, this section shall apply in a charter city of 2,000,000 or more population to a zoning ordinance adopted prior to January 1, 1979, which zoning ordinance shall be consistent

17

with the general plan of such city by July 1, 1982."[9] (See *City of Los Angeles*, *supra*, at p. 531.) At the time the case was decided, only the City of Los Angeles fell within that statutory classification. (*Id*. at p. 533.) The appellate court emphasized the size of the City of Los Angeles, and it upheld Government Code section 65860, subdivision (d), against the facial constitutional challenges. (*City of Los Angeles*, *supra*, at pp. 529, 532-535.) In contrast, none of the provisions of the Park Act expressly applies to any charter city.

Save Sunnyvale has not established that the general preservation of public parks is now a matter of statewide concern. Accordingly, there is no need to resolve the correctness of the superior court's further finding that, even assuming arguendo that the Park Act applied to charter cities, section 5401, subdivision (a), did not apply to "the subject property" because it was not in use as a public park when the City acquired it from Santa Clara Unified School District in 1979.[10] Our conclusion also renders moot the issue whether the superior court erred in denying Save Sunnyvale's request to take judicial notice of the legislative history of the bills enacting the Park Act in 1971 or amending it in 1975.

There is no reasonable possibility that the petition can be amended to state a cause of action for violation of the Park Act. The trial court did not abuse its discretion in sustaining the demurrer to the second cause of action without leave to amend.

---

[9] Government Code section 65803 provides: "Except as otherwise provided, this chapter shall not apply to a charter city, except to the extent that the same may be adopted by charter or ordinance of the city."

[10] We observe that, since Stratford is the acquiring entity with respect to its purchase of the RAC property and not a "city, city and county, county, public district, or agency of the state" (§ 5401, subd. (a)), it appears that section 5401, subdivision (a), would not apply to that acquisition. We do not resolve whether a joint use agreement that gives priority use of a public park at certain times to a private entity constitutes an "acquisition" within the meaning of the Park Act.

III

*CEQA*

A. *Background*

Under CEQA, "[a]ll local agencies shall prepare, or cause to be prepared by contract, and certify the completion of, an environmental impact report on *any project* that they intend to carry out or approve which may have a significant effect on the environment." (Pub. Resources Code, § 21151, subd. (a), italics added.)  For purposes of this requirement, "any significant effect on the environment shall be limited to substantial, or potentially substantial, adverse changes in physical conditions which exist within the area as defined in Section 21060.5." (§ 21151, subd. (b); see § 21068 [" 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment."]; Cal. Code Regs., tit. 14, § 15382[11].)  " 'Environment' means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (§ 21060.5; see Cal. Code Regs., tit. 14, § 15360.)

"An environmental impact report is an informational document which, when its preparation is required by this division, shall be considered by every public agency prior to its approval or disapproval of a project.  The purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list

---

[11] Regulatory guidelines implementing CEQA, commonly referred to as the CEQA Guidelines, are codified in the California Code of Regulations, title 14, section 15000 et seq.  (See § 21083 [authority for guidelines].)  "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous. [Citations.]"  (*Vineyard Area Citizens for Responsible Growth*, *Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5 (*Vineyard Area Citizens for Responsible Growth*).)

ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (§ 21061, see § 21100; Cal. Code Regs., tit. 14, §§ 15132, 15362.)

"Project" is broadly defined by CEQA to mean "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency. [¶] (b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (§ 21065.) The first step in the CEQA review process is determining whether a proposed activity is a "project." (See *Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 286 (*Tomlinson*); *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 171, fn. 7.) "An activity that is not a 'project' as defined in the Public Resources Code (see § 21065) and the CEQA Guidelines (see § 15378) is not subject to CEQA. (CEQA Guidelines, § 15060, subd. (c)(3).)" (*Muzzy Ranch Co. v. Solano County Airport Land Use Com'n* (2007) 41 Cal.4th 372, 380.)

" 'Project' means the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (Cal. Code Regs., tit. 14, § 15378, subd. (a).) "The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Cal. Code Regs., tit. 14, § 15378, subd. (c).)

"CEQA contemplates consideration of environmental consequences at the ' "earliest possible stage, even though more detailed environmental review may be

20

necessary later." ' [Citation.]  The requirements of CEQA cannot be avoided by piecemeal review which results from 'chopping a large project into many little ones— each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences.' " (*Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 370).  On the other hand, ' " '[W]here future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences.' [Citation.]" ' [Citation.]" (*Environmental Protection Information Center v. California Dept. of Forestry and Fire Protection* (2008) 44 Cal.4th 459, 503.)

The CEQA Guidelines set forth categorical exemptions from CEQA for certain types of projects.[12]  There is a categorical exemption for "sales of surplus government property except for parcels of land located in an area of statewide, regional, or areawide concern identified in Section 15206(b)(4)" and even a sale of surplus government property "located in any of those areas" may be exempted under specified conditions. (Cal. Code Regs., tit. 14, § 15312.)  Another section of the CEQA Guidelines provides, however, that a "categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Cal. Code Regs., tit. 14, § 15300.2, subd. (c).)

---

[12] "By statute, the Legislature has . . . directed the Secretary of the Natural Resources Agency (Secretary) to establish 'a list of classes of projects that have been determined not to have a significant effect on the environment and that shall be exempt from' CEQA.  (§ 21084, subd. (a).)  'In response to that mandate,' the Secretary 'has found' that certain 'classes of projects . . . do not have a significant effect on the environment . . .' and, in administrative regulations known as guidelines, has listed those classes and 'declared [them] to be categorically exempt from the requirement for the preparation of environmental documents.'  (Cal. Code Regs., tit. 14, § 15300; see *id*., § 15000 et seq., Guidelines for Implementation of CEQA (Guidelines).)" (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1092.)

Where a project is not exempt and an EIR is required, the question of when it must be prepared and considered arises. In *Save Tara*, *supra*, 45 Cal.4th 116, the California Supreme Court stated that "at a minimum an EIR must be performed before a project is approved, for '[i]f postapproval environmental review were allowed, EIR's would likely become nothing more than *post hoc* rationalizations to support action already taken.' (*Laurel Heights* [*Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376,] 394.)" (*Id.* at p. 130.) On the other hand, "[a]n agency cannot be deemed to have approved a project, within the meaning of sections 21100 and 21151, unless the proposal before it is well enough defined 'to provide meaningful information for environmental assessment.' (Cal. Code Regs., tit. 14, § 15004, subd. (b).)" (*Id.* at p. 139.)

"A claim . . . that the lead agency approved a project with potentially significant environment effects *before* preparing and considering an EIR for the project 'is predominantly one of improper procedure' (*Vineyard Area Citizens for Responsible Growth*, *Inc. v. City of Rancho Cordova*, *supra*, 40 Cal.4th at p. 435) to be decided by the courts independently. The claim goes not to the validity of the agency's factual conclusions but to the required timing of its actions. . . . [T]he timing question may also be framed by asking whether a particular agency action is in fact a 'project' for CEQA purposes, and that question, we have held, is one of law. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 382; *Fullerton* [*Joint Union High School Dist. v. State Bd. Of Education* (1982)] 32 Cal.3d [779,] 795.)" (*Save Tara*, *supra*, 45 Cal.4th at p. 131, fn. omitted.)

In *Save Tara*, the Supreme Court observed: "A public entity that, in theory, retains legal discretion to reject a proposed project may, by executing a detailed and definite agreement with the private developer and by lending its political and financial assistance to the project, have as a practical matter committed itself to the project. When an agency has not only expressed its inclination to favor a project, but has increased the

22

political stakes by publicly defending it over objections, putting its official weight behind it, devoting substantial public resources to it, and announcing a detailed agreement to go forward with the project, the agency will not be easily deterred from taking whatever steps remain toward the project's final approval." (*Save Tara*, *supra*, 45 Cal.4th at p. 135.)

Despite these observations, the Supreme Court eschewed "a bright-line rule defining when an approval [of a project] occurs." (*Save Tara*, *supra*, 45 Cal.4th at p. 138.) It rejected the suggestion that "any agreement, conditional or unconditional, would be an 'approval' requiring prior preparation of CEQA documentation if at the time it was made the project was sufficiently well defined to provide ' "meaningful information for environmental assessment." ' [Citation.]") (*Id*. at p. 136.) It observed that, on such "theory, once a private project had been described in sufficient detail, *any* public-private agreement related to the project would require CEQA review." (*Ibid*.)

Instead, *Save Tara* applied "the general principle that before conducting CEQA review, agencies must not 'take any action' that significantly furthers a project 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project.' (Cal. Code Regs., tit. 14, § 15004, subd. (b)(2)(B); accord, [*Concerned*] *McCloud* [*Citizens v*. *McCloud Community Services Dist*. (2007)] 147 Cal.App.4th [181,] 196 [agreement not project approval because, inter alia, it 'did not restrict the District's discretion to consider any and all mitigation measures, including the "no project" alternative']; *Citizens for Responsible Government v*. *City of Albany* (1997)] 56 Cal.App.4th [1199,] 1221 [development agreement was project approval because it limited city's power 'to consider the full range of alternatives and mitigation measures required by CEQA'].)" (*Save Tara*, *supra*, 45 Cal.4th at p. 138.) The court explained that, in applying that principle, "courts should look not only to the terms of the agreement but to the surrounding circumstances to determine whether, as a practical matter, the agency has committed itself to the project as a whole or to any

23

particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project. (See Cal. Code Regs, tit. 14, § 15126.6, subd. (e).)" (*Id.* at p. 139.)

"[W]hen the prospect of agency commitment mandates environmental analysis of a large-scale project at a relatively early planning stage, before all the project parameters and alternatives are reasonably foreseeable, the agency may assess the project's potential effects with corresponding generality. With complex or phased projects, a staged EIR (Cal. Code Regs., tit. 14, § 15167) or some other appropriate form of tiering (see *In re Bay-Delta etc*. (2008) 43 Cal.4th 1143, 1170; *Vineyard Area Citizens for Responsible Growth*, *supra,* 40 Cal.4th at p. 431) may be used to postpone to a later planning stage the evaluation of those project details that are not reasonably foreseeable when the agency first approves the project." (*Save Tara*, *supra*, 45 Cal.4th at p. 139.)

B. *Issue Exhaustion Requirement under Section 21177*

1. *Save Sunnyvale's Contentions*

The trial court found that, although Save Sunnyvale had satisfied the objection requirement of section 21177, subdivision (b),[13] it had not satisfied the issue exhaustion requirement of section 21177, subdivision (a). It concluded that Save Sunnyvale's

---

[13] Section 21177, subdivision (b), provides: "A person shall not maintain an action or proceeding unless that person objected to the approval of the project orally or in writing during the public comment period provided by this division or prior to the close of the public hearing on the project before the filing of the notice of determination pursuant to Sections 21108 and 21152." Section 21177 does not, however, "preclude any organization formed after the approval of a project from maintaining an action pursuant to Section 21167 if *a member of that organization* has complied with subdivision (b)." (§ 21177, subd. (c), italics added.) Save Sunnyvale alleged in its petition that its articles of incorporation were filed with the California Secretary of State on January 2, 2014. A declaration of Tappan Merrick in support of the petition stated that he was a member of Save Sunnyvale. The administrative record reflects that Merrick spoke at the November 19, 2013 and December 3, 2013 council meetings.

CEQA claim under *Save Tara* was barred by the fact that no member of the public raised the issue in the administrative process. Save Sunnyvale now maintains that the City was "adequately apprised" that CEQA compliance should precede approval of the sale and joint use agreements because members of the public "warned" of "the 'relevant facts' of unanalyzed and severe cumulative traffic impacts" and those warnings satisfied the exhaustion requirement.

2. *Issue Exhaustion Under Section 21177, Subdivision (a)*

Subdivision (a) of section 21177 states: "An action or proceeding shall not be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were *presented to the public agency* orally or in writing *by any person* during the public comment period provided by this division or prior to the close of *the public hearing* on the project before the issuance of the notice of determination." (Italics added.)

In *Tomlinson*, *supra*, 54 Cal.4th 281, the county held public hearings, and it then determined that the proposed project was categorically exempt from compliance with CEQA and approved the project. (*Id*. at pp. 285, 288.) The county did not file a notice of determination. (*Id*. at p. 290.) The California Supreme Court "disagree[d] with the Court of Appeal's conclusion that the public hearing provision in section 21177's subdivision (a) does not apply when . . . no notice of determination is filed." (*Ibid*.) The court stated: "*If* a notice of determination is filed, the public hearing provision requires a party wishing to challenge the project in court to raise the party's objections to the project at a public hearing held before the notice of determination is filed. But if no such notice is filed, the public hearing provision nonetheless applies. In that situation, the challenging party is still required to exhaust its administrative remedies by presenting its objections to the project to the pertinent public agency, so long as it is given the opportunity to do so at a public hearing held *before the project is approved*. When, as in this case, a party is given such an opportunity, and it fails to raise a particular objection to the project, it may not

25

raise that objection in court, because it has not satisfied the exhaustion requirement of section 21177's subdivision (a)." (*Ibid*.)

In *Tomlinson*, *supra*, 54 Cal.4th 281, the Supreme Court "perceive[d] no conflict between [its] conclusion and the principles underlying the common law doctrine requiring exhaustion of administrative remedies before bringing a court action." (*Id*. at p. 291.) The court stated: "We have described that doctrine as ' "a jurisdictional prerequisite to resort to the courts." ' (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd*. (2005) 35 Cal.4th 1072, 1080.) ' " 'The basic purpose for the exhaustion doctrine is to lighten the burden of overworked courts in cases where administrative remedies are available and are as likely as the judicial remedy to provide the wanted relief.' [Citation.] Even where the administrative remedy may not resolve all issues or provide the precise relief requested by a plaintiff, the exhaustion doctrine is still viewed with favor 'because it facilitates the development of a complete record that draws on administrative expertise and promotes judicial efficiency.' [Citation.] It can serve as a preliminary administrative sifting process [citation], unearthing the relevant evidence and providing a record which the court may review." ' (*Sierra Club v. San Joaquin Local Agency Formation Com*. (1999) 21 Cal.4th 489, 501.)" (*Ibid*.)

3. *Analysis*

*Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151 (*Citizens*), which is cited by Save Sunnyvale, applied the principle of issue exhaustion but did not specifically apply section 21177, which was enacted in 1984. (Stats. 1984, ch. 1514, § 14, pp. 5344-5345.) In *Citizens*, defendants contended that "before an issue may be litigated by plaintiffs it must have been raised by them before the administrative agency." (*Id*. at p. 162.) The appellate court commented: "[L]ess specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding. This is because ' "[i]n administrative

26

proceedings, [parties] generally are not represented by counsel.  To hold such parties to knowledge of the technical rules of evidence and to the penalty of waiver for failure to make a timely and specific objection would be unfair to them." [Citation.]  It is no hardship, however, to require a layman to make known what facts are contested.' [Citation.]" (*Citizens*, *supra*, at p. 163.)

In *Park Area Neighbors v. Town of Fairfax* (1994) 29 Cal.App.4th 1442 (*Fairfax*), the court was dealing with two statutory exhaustion requirements, one under Government Code section 65009[14] and the other under the town's municipal code.  (*Fairfax*, *supra*, at pp. 1447-1448.)  The appellate court in *Fairfax* determined that "less specificity" did not "mean an objection need not be raised at all, or a prescribed appeal procedure need not be followed." (*Id*. at p. 1449.)  Objections had to be made "known in *some* fashion, however unsophisticated" because "[o]therwise, the town would have no opportunity to respond to those objections prior to judicial review—which is the 'essence of the exhaustion doctrine.' (*Coalition for Student Action v. City of Fullerton* [(1984)] 153 Cal.App.3d [1194,] 1198.)" (*Ibid*.)  It concluded:  "The complete failure of [petitioner's] members to assert any challenge before the planning commission or town council to the project's compliance with density ordinances, the applicability of the adjustment exclusion and the lack of a resolution on traffic study methodology, or to appeal the planning commission's actions in the manner prescribed by the town code, precludes the assertion of those challenges in this judicial proceeding.  The neighbors' expressions of

---

[14] Government Code section 65009, subdivision (b)(1), provides:  "In an action or proceeding to attack, review, set aside, void, or annul a finding, determination, or decision of a public agency made pursuant to this title at a properly noticed public hearing, the issues raised shall be limited to those raised in the public hearing or in written correspondence delivered to the public agency prior to, or at, the public hearing, except where the court finds either of the following:  [¶]  (A) The issue could not have been raised at the public hearing by persons exercising reasonable diligence.  [¶]  (B) The body conducting the public hearing prevented the issue from being raised at the public hearing."

27

concern about the number of potential residents, parking, traffic and density in the neighborhood were too general to alert the town to the issues now asserted. (*Coalition for Student Action v. City of Fullerton, supra,* 53 Cal.App.3d at pp. 1197-1198.) The only substantive point asserted by [petitioner] that is cognizable on appeal is the claim, specifically voiced by a neighbor at the town council meeting, that the 1991 traffic study improperly relied on the prior study by the IH consultant. Even under the 'less specificity' rule applicable to unrepresented persons in administrative proceedings [citation], only the latter point can be said to have been asserted at the administrative level." (*Fairfax, supra,* at p. 1450, fn. omitted.)

In *Evans v. City of San Jose* (2005) 128 Cal.App.4th 1123 (*Evans*), the trial court determined that a property owner, who had filed an action against the City of San Jose and its redevelopment agency challenging the validity of a redevelopment plan for blighted areas under California Community Redevelopment Law (CRL) (Health & Safety Code § 33000 et seq.), "failed to exhaust her administrative remedies by not raising her detailed and specific challenges to the evidence underlying the [redevelopment plan] during the administrative process, so that the Agency could evaluate and respond to her objections."[15] (*Evans, supra,* at pp. 1135-1136.) This court recognized: "The purposes

---

[15] Health and Safety Code section 33501.2, which was enacted in 2006 (Stats. 2006, ch. 595, § 18, pp. 4927-4928), now provides: (a) "An action shall not be brought pursuant to Section 33501 unless the alleged grounds for noncompliance with this division were presented to the agency or the legislative body orally or in writing by any person before the close of the public hearing required by this division. [¶] (b) A person shall not bring an action pursuant to Section 33501 unless a person objected to the decision of the agency or the legislative body before the close of the public hearing required by this division. [¶] (c) This section does not preclude any organization formed after the approval of a project from bringing an action pursuant to Section 33501 if a member of that organization has complied with subdivision (b). [¶] (d) This section does not apply to the Attorney General. [¶] (e) This section does not apply to any alleged grounds for noncompliance with this division for which there was no public hearing or other opportunity for members of the public to raise those objections orally or in writing (continued)

28

of the [exhaustion] doctrine are not satisfied if the objections are not sufficiently specific so as to allow the Agency the opportunity to evaluate and respond to them. (*Park Area Neighbors v. Town of Fairfax* (1994) 29 Cal.App.4th 1442, 1447 (*Fairfax*).) 'The essence of the exhaustion doctrine is the public agency's opportunity to receive and respond to articulated factual issues and legal theories *before* its actions are subjected to judicial review.' (*Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1198 (*Fullerton* ), italics in original.)" (*Id*. at p. 1138.)

In *Evans*, *supra*, 128 Cal.App.4th 1123, we were guided in part by *Fullerton*, which we quoted: " 'The doctrine [of exhaustion of administrative remedies] was not satisfied here by a relatively few bland and general references to environmental matters. The city was entitled to consider any objection to proceeding by negative declaration in the first instance, if there was one. Mere objections to the *project*, as opposed to the procedure, are not sufficient to alert an agency to an objection based on CEQA. Petitioners, having failed to raise their CEQA claims at the administrative level, cannot air them for the first time in the courts.' (*Fullerton*, *supra*, 153 Cal.App.3d at p. 1198.)" (*Id*. at p. 1139.) We determined: "General complaints to the administrative agency that certain neighborhoods are not blighted are not sufficient to alert the agency to objections based on the method of data gathering and analysis employed by the writers of the report. Such general complaints do not allow the agency the opportunity to respond and to redress the alleged deficiencies. (See *Fullerton*, *supra*, 153 Cal.App.3d at p. 1198.)" (*Id*. at p. 1145.) We concluded in part that "appellant may not make her arguments here cataloguing alleged deficiencies in the statistics-gathering methods employed by KMA and challenging the analysis of compiled data set forth in the Existing Conditions Report." (*Ibid*.)

---

before the decision by the agency or the legislative body, or if the agency or the legislative body failed to give the notice required by law."

General principles as to the degree of specificity required to accomplish issue exhaustion before an administrative agency apply to CEQA cases subject to section 21177. (See *North Coast Rivers Alliance v. Marin Municipal Water District Board of Directors* (2013) 216 Cal.App.4th 614, 623-624; *Planning and Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 250-251; *Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 909-910.) Our review of the public comments identified by Save Sunnyvale has confirmed that members of the public voiced their concerns about various impacts of a private school operating on the site of the former RAC and the school's joint use of the adjacent Raynor Park open space, which the City would continue to own under the agreements.

While public comments very generally raised some environmental concerns, particularly related to traffic, none of the comments remotely raised the issue of the proper timing of environmental review. Certainly, none presented the specific issue whether *Save Tara* required CEQA review to be conducted before approval of the proposed agreements rather than in conjunction with the use permit application. Even if liberally construed, the comments were far too general to alert the City and the Council to the timing issue and prompt them to evaluate whether they had to proceed differently to comply with CEQA and avoid violating the principles of *Save Tara.*

C. *Notice Exception to Requirement of Issue Exhaustion*

1. *Save Sunnyvale's Contentions*

Save Sunnyvale alternatively contends that, under section 21177, subdivision (e), it was excused from complying with the issue exhaustion requirement of section 21177, subdivision (a). Section 21177, subdivision (e), provides: "This section does not apply to any alleged grounds for noncompliance with this division for which there was no public hearing or other opportunity for members of the public to raise those objections

30

orally or in writing prior to the approval of the project, *or if the public agency failed to give the notice required by law*." (Italics added.)

Save Sunnyvale's petition alleged, among other things, that "any bar to this action in [section] 2117[7] is inapplicable because the City failed to give the 2 weeks' notice required by law under City Council policy adopted May 8, 2012." It now asserts the City misrepresented that it had to wait until it received Stratford's use permit application to have sufficient factual detail to comply with CEQA and that "misrepresentation" was tantamount to a lack of "notice required by law" within the meaning of section 21177, subdivision (e). In addition, Save Sunnyvale contends that the notice problem was "exacerbated" by the failure of the City's staff to provide two weeks' notice of those council meetings as supposedly agreed upon by the Council in a May 8, 2012 meeting.

2. *Background*

Save Sunnyvale has not asserted or shown that the Council failed to comply with a specific statute, city charter provision, or municipal ordinance that required advance notice of the November 19, 2013 and December 3, 2013 council meetings.[16] Save

---

[16] Government Code section 54954.2 provides: "At least 72 hours before a regular meeting, the legislative body of the local agency, or its designee, shall post an agenda containing a brief general description of each item of business to be transacted or discussed at the meeting, including items to be discussed in closed session. A brief general description of an item generally need not exceed 20 words. The agenda shall specify the time and location of the regular meeting and shall be posted in a location that is freely accessible to members of the public and on the local agency's Internet Web site, if the local agency has one." (See Gov. Code, § 54951 ["local agency" includes charter city].) Section 613 of Article VI of the Sunnyvale charter provides in part: "The City Clerk shall cause the publication, in a newspaper widely circulated within the City, or on a City Website accessible through Internet or other appropriate technology, of items listed on the agenda prepared for regular meetings of the City Council which the City Manager shall deem of significance or of interest to the residents of Sunnyvale. Such publication or Internet distribution shall be in accordance with procedures which shall be established by ordinance of the City Council, and shall be designed to provide reasonable public notice in a manner which will permit current information to be disseminated widely within the City."

31

Sunnyvale acknowledges in its appellate brief that the City gave five-day notice of each of the council meetings on November 19, 2013 and December 3, 2013 to the public by posting the notices on the Internet and at the city hall and the City provided e-mail notice to certain groups and individuals. The "Notice and Agenda" for each of those meetings informed the public that the agenda reports to the Council could be viewed on the City's web site, the address of which was provided.

The "Notice and Agenda" for the November 19, 2013 council meeting described agenda item RTC 13-275 as follows: "Discussion and Possible Action Regarding Approval of the Purchase and Sales Agreement for Raynor Activity Center . . . and a Joint Use Agreement for the Raynor Park Open Space Area and Adoption of a Finding that the Purchase and Sales Agreement Does not Constitute a Project Under [CEQA]." That "Notice and Agenda" specified that the staff was recommending that the Council authorize the city manager to execute the proposed sale agreement and the proposed joint use agreement and that the Council "[f]ind that approval of the [sale agreement] is not a project under CEQA and direct staff to conduct further environmental analysis as part of the use permit process."

With respect to environmental review, the staff report for the November 19, 2013 council meeting specifically stated: "The [proposed sale agreement] provides that sale of the property is contingent upon Stratford obtaining a use permit from the City for the private school use. Project level CEQA review related to the proposed use by Stratford will be conducted at the time Stratford submits the use permit application, when there is sufficient project detail to be able to conduct meaningful analysis. CEQA review is not required at this time because approval of the [proposed sale agreement] alone does not constitute a project within the meaning of CEQA. . . . The Agreement furthers the goals of due diligence and planning activities related to the potential operation of a private school on the subject site, but does not at this time approve a development or use, or commit the City to a particular defined development project or use."

The "Notice and Agenda" for the December 3, 2013 council meeting described agenda item RTC 13-292 as follows:  "Discussion and Possible Action Regarding Approval of a Joint Use Agreement for Raynor Park Open Space with Stratford School." With respect to the proposed, renegotiated joint use agreement, the staff report for the December 3, 2013 council meeting stated:  "CEQA review is not required at this time because approval of the Joint Use Agreement for Raynor Park Open Space alone does not constitute a project within the meaning of CEQA.  CEQA analysis will be conducted as part of the use permit process that is required to be completed before the property is transferred."

At the December 3, 2013 council meeting, City Councilmember David Whittum expressed concern that, on May 8, 2012, the Council had passed a motion requiring two weeks' notice before the City took action on the RAC property and the Council was violating its own policy.  City Attorney Joan Borger indicated that the policy of giving two weeks' notice was not legally binding.

3. *Forfeiture Rule*

On July 25, 2014, only days before the hearing on the petition scheduled for August 1, 2014, Save Sunnyvale filed an ex parte application for permission to file supplemental briefing.  In the proffered supplemental brief, Save Sunnyvale argued for the first time that "[t]he City's misrepresentation that it had to wait for the use permit application to receive the factual detail necessary to comply with CEQA" was "tantamount to a lack of notice required by law" within the meaning of section 21177, subdivision (e), and that notice problem was exacerbated by the violation of the Council's two weeks' notice policy.  The trial court denied the application.  In ruling on the petition following the August 1, 2014 hearing, the trial court did not address the argument.

The City now argues that Save Sunnyvale's claim that the City was required to give two weeks' notice of the proposed action on the RAC property pursuant to the Council's adopted policy should be "deemed waived" because the trial court did not

33

allow Save Sunnyvale to file its supplemental brief. We find that Save Sunnyvale's contention that it was excused from issue exhaustion under section 21177, subdivision (e), because the City misrepresented that it would not have the factual details to comply with CEQA until it received Stratford's use permit application and the Council failed to adhere to its two weeks' notice policy was forfeited by its failure to timely raise it below. (See *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264-265.) Even if the contention was properly preserved, we find it meritless.

4. *Analysis*

The appellate record does not contain an administrative record of the May 8, 2012 council meeting. Without an administrative record of that council meeting and the purported motion, we are unable to evaluate whether the two weeks' notice policy had the force of law. In addition, Save Sunnyvale has not cited any authority suggesting that the policy was legally binding.

In support of its main claim that the City's "misrepresentation" amounted to a lack of notice, Save Sunnyvale cites *McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136 (*McQueen*), disapproved on another ground in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576, fn. 6, and *Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683 (*Woodward Park*). This case is readily distinguishable from both of those cases.

In *McQueen*, a project involved acquisition of property containing toxic and hazardous substances by a regional open space district. (*McQueen*, *supra*, 202 Cal.App.3d at p. 1145.) "The district's notice of CEQA exemption simply described the project as the acquisition of named surplus federal property for public open space. (§ 15062, subd. (a)(1).)" (*Id.* at p. 1144.) The appellate court in *McQueen* "consider[ed] petitioner's situation tantamount to a lack of notice due to the incomplete and misleading project description employed by the district." (*Id.* at p. 1150.) "While there [was] evidence the district gave notice of the proposed property acquisition, there [was] no

34

evidence that the notice mentioned the acquisition of toxic, hazardous substances." (*Ibid.*)  The appellate court reasoned:  "To apply the exhaustion requirement under these circumstances would stand CEQA on its head and encourage a public agency to leave environmental concerns out of its announced plans.  It would require the public to ferret out the true nature of the public agency's project and its possible environmental consequences." (*Id*. at p. 1151.)  The court concluded that McQueen had "adequately raised the objections available at the time.  [Citations.]"  (*Ibid.*)

In *Woodward Park,* "[t]he approved project consisted of 274,000 square feet of office space and a 203,000-square-foot retail shopping center" and possibly 20 or so apartments. (*Woodward Park*, *supra*, 150 Cal.App.4th at p. 692.)  The city approved an EIR and a statement of overriding considerations (*id*. at p. 706), and it "decided to approve the project even though the EIR found significant, unavoidable air and traffic impacts that would not be mitigated to an insignificant level . . . ." (*Id*. at p. 699.)

As to exhaustion under section 21177, the appellate court in *Woodard Park* stated: "There is no evidence in the record that the statement of overriding considerations was made available to the public before the day of the city council meeting at which it was adopted.  No draft statement is attached to the draft EIRs that were distributed to the public earlier in the process.  At least two of the comment letters stated that there were no overriding considerations mentioned in the final circulated version of the EIR.  As far as we can tell from the record, the public had only the day of the meeting to review and analyze the statement.  Under these circumstances, it is uncertain whether the exhaustion requirement even applies to objections to the statement of overriding considerations.  Assuming it does, where the agency's own action severely limited the public's opportunity to review and analyze the document, it would be antithetical to the purposes of CEQA to require the public to articulate precise factual and legal objections to the statement as a precondition to litigating those issues." (*Woodward Park*, *supra*, 150 Cal.App.4th at p. 720.)

35

Here, there is no claim that the notices or staff reports for the November 19, 2013 and December 3, 2013 council meetings factually mischaracterize the scope of the project or the decisions on the agendas for those meetings. Nevertheless, Save Sunnyvale attempts to cast the staff's assessment of the proper timing of CEQA review as a factual misrepresentation. We reject this contention. The public was on notice of the City's conclusions regarding the proper timing of environmental review under CEQA and the degree of detail in the proposed agreements and a member of the public could have raised concerns about or objections to that timing at those meetings. Save Sunnyvale neither argues nor shows that the City failed to make a crucial document available to the public for review before those meetings.

We conclude that Save Sunnyvale has not established that it was excused from the requirement of issue exhaustion under section 21177, subdivision (a), because the City or Council "failed to give the notice required by law" (§ 21177, subd. (e)).

D. *Application of Section 21177, Subdivision (a), Not Constitutionally Barred*

Save Sunnyvale asserts that the requirements of section 21177 impermissibly infringe its right to petition the government for redress of grievances as guaranteed in California Constitution, article I, section 3. It asserts that its "claim that the exhaustion doctrine impermissibly infringes the right to petition is one of first impression."

"The right to petition the government for redress of grievances is protected by both the federal and state Constitutions. (U.S. Const., 1st Amend.; Cal. Const., art. I, § 3.)"[17] (*Vargas v. City of Salinas* (2011) 200 Cal.App.4th 1331, 1342 (*Vargas*).) "[T]he right to petition extends to all departments of the Government. The right of access to the

_____

[17] The First Amendment to the United States Constitution provides: "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." In addition, under California Constitution, Article I, section 3, "[t]he people have the right to . . . petition government for redress of grievances . . . ."

36

courts is indeed but one aspect of the right of petition.  [Citations.]"  (*California Motor Transport Co. v. Trucking Unlimited* (1972) 404 U.S. 508, 510 (*California Motor Transport*).)  "The right includes the right to petition the executive or legislative branches directly."  (*Vargas*, *supra*, 200 Cal.App.4th at p. 1342; see *City of Long Beach v. Bozek* (1982) 31 Cal.3d 527, 533-534 (*Bozek*), judgment vacated and case remanded in *City of Long Beach v. Bozek* (1983) 459 U.S. 1095 and opn. reiterated in *City of Long Beach v. Bozek* (1983) 33 Cal.3d 727, 728 ["the right of petition protects attempts to obtain redress through the institution of judicial proceedings as well as through importuning executive officials and the Legislature"].)

"The legislative history of California Constitution article I, section 3, reveals an intent to make the California provision at least as broad as the First Amendment right of petition.  Article I, section 10 of the California Constitution, originally enacted in 1849, stated:  'The people shall have the right to freely assemble together to consult for the common good, to instruct their representatives, and to petition *the Legislature* for redress of grievances.'  (Italics added.)  On November 5, 1974, the voters of this state adopted the following amended and renumbered provision:  'The people have the right to instruct their representatives, petition *government* for redress of grievances, and assemble freely to consult for the common good.'  (Italics added.)  (Cal. Const., art. I, § 3.)  The amendment was clearly intended to broaden the right of petition to make it extend to petitions to all branches of government, not merely to the Legislature.  [Citation.]"  (*Bozek*, *supra*, 31 Cal.3d at p. 534, fn. 4.)

The right to petition the government has never been considered absolute.  (See *Vargas*, *supra*, 200 Cal.App.4th at p. 1132; see also *Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322, 365 ["There is no fundamental First Amendment right to petition the courts by filing a SLAPP" and "the mandatory fee-shifting provision of section 425.16(c) does not bar [the plaintiff] or any other plaintiff from bringing a meritorious claim."]; *Wolfgram v. Wells Fargo Bank* (1997) 53

37

Cal.App.4th 43, 59 ["the vexatious litigant statute does not impermissibly 'chill' the right to petition"]; *Bill Johnson's Restaurants*, *Inc*. *v*. *N.L.R.B.* (1983) 461 U.S. 731, 743 (*Bill Johnson's Restaurants*) ["baseless litigation is not immunized by the First Amendment right to petition"].)  The right does not compel the government to listen or grant relief. (See *Smith v*. *Arkansas State Highway Emp*., *Local 1315* (1979) 441 U.S. 463, 465 (*per curiam*) ["[T]he First Amendment does not impose any affirmative obligation on the government to listen, to respond or, in this context, to recognize the association [a union] and bargain with it.  [Fn. omitted.]"]; *We the People Foundation*, *Inc*. *v*. *United States* (D.C. Cir. 2007) 485 F.3d 140, 144 [no right to receive response to or official consideration of a petition]; *Canfora v*. *Olds* (6th Cir. 1977) 562 F.2d 363, 364 [no constitutional guarantee that petitions for the redress of grievances will succeed].)

To exercise the right of petition in the courts, a litigant must comply with applicable rules of procedure.  (See *United States v*. *State of Mich.* (W.D. Mich. 1978) 460 F.Supp. 637, 639; *Shelton v*. *Pittsburg County Bd. of Commissioners* (10th Cir. Aug. 12, 1997) 1997 U.S. App. LEXIS 21263.)  In addition, the constitutional right of access to the courts[18] to assert such procedural and substantive rights as may be available under state and federal law does not establish the types of claims that the state and federal courts must hear.  (See *Bounds v*. *Smith* (1977) 430 U.S. 817, 833 (conc. opn. of Powell, J.) [rights of prison inmates].)  "However unsettled the basis of the constitutional right of access to courts, . . . the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court."[19]  (*Harbury*, *supra*, 536 U.S. at p. 415, fn. omitted.)

_____

[18] "[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances."  (*Bill Johnson's Restaurants*, *supra*, 461 U.S. at p. 741; see *California Motor Transport*, *supra*, 404 U.S. at p. 513.)

[19] "Decisions of [the United States Supreme] Court have grounded the right of access to courts in the Article IV Privileges and Immunities Clause [citations], the First Amendment Petition Clause [citations], the Fifth Amendment Due Process Clause (continued)

Section 21177 is part of CEQA and there is no statutory right to bring "an action or proceeding to attack, review, set aside, void, or annul" a public agency's act or decision on the grounds of noncompliance with CEQA (§ 21167) unless section 21177's procedural prerequisites are inapplicable, satisfied, or excused. A right of action that depends solely on statute "exists only so far and in favor of such person as the legislative power may declare. (*Justus v. Atchison* (1977) 19 Cal.3d 564, 575 [, disapproved on another point in *Ochoa v. Superior Court* (1985) 39 Cal.3d 159, 171].)" (*Graczyk v. Workers' Comp. Appeals Bd.* (1986) 184 Cal.App.3d 997, 1007, fn. omitted; see *Surrey v. True Beginnings* (2008) 168 Cal.App.4th 414, 417-418 ["The prerequisites for standing to assert statutorily based causes of action are to be determined from the statutory language, as well as the underlying legislative intent and the purpose of the statute. [Citation.]"].)

Since the constitutional right to petition the government for redress of grievances encompasses the Legislature, administrative bodies, and the courts and it does not create the right to litigate whatever grievance one might wish in the courts, we cannot agree that the right to petition excuses compliance with the requirement of issue exhaustion under section 21177, subdivision (a). Moreover, an issue exhaustion requirement does not preclude access to the courts where relief is not secured in the administrative forum. In fact, Save Sunnyvale was not denied access to the courts; it filed its claims in Santa Clara County Superior Court, which considered them, and it has appealed the judgment to this court, which has reviewed its contentions.

---

[citations], and the Fourteenth Amendment Equal Protection [citation] and Due Process Clauses [citations]." (*Christopher v. Harbury* (2002) 536 U.S. 403, 415, fn. 12 (*Harbury*).)

Save Sunnyvale has not demonstrated that section 21177's issue exhaustion requirement operates in contravention of its right to petition the government for redress of grievances.

E. *Conclusion*

Save Sunnyvale's failure to satisfy the issue exhaustion requirement of section 21177, subdivision (a), prevents it from raising *Save Tara* issues in this judicial proceeding. This conclusion renders moot Save Sunnyvale's further appellate claim that the trial court erred in denying its motion to augment the administrative record with the responses to the City's request for proposals to purchase the RAC.[20]

## DISPOSITION

The judgment is affirmed. Respondents are entitled to costs on appeal.

---

[20] We note, however, that CEQA does not apply to "[p]rojects which a public agency rejects or disapproves." (§ 21080, subd. (b)(5).)

 

 

 

_____
                   ELIA, J.

WE CONCUR:

_____
RUSHING, P. J.

_____
PREMO, J.

*Save Sunnyvale Parks & Schools*, *Inc. v. City of Sunnyvale et al.*
H041462